CASTLE v. LEWIS, Sheriff.

TULK v. SAME.

(Circuit Court of Appeals, Eighth Circuit. December 4, 1918.)

Nos. 5073, 5074

1. HABEAS CORPUS ⬅45(3)—FEDERAL COURTS—JURISDICTION.

When a person is in custody under process of a state court for an alleged offense against the laws of the state, and it is claimed that he is held in violation of the Constitution or of a law or treaty of the United States, or for an act done or omitted pursuant to a law of the United States, the federal courts. under Rev. St. §§ 751–753 (Comp. St. §§ 1279–1281), have plenary jurisdiction to inquire into the cause of such confinement by means of habeas corpus and to discharge the petitioner.

2. HABEAS CORPUS ⬅111(1)—FEDERAL COURT—DISCHARGE.

While the federal court or judge has the jurisdiction and power, under Rev. St. §§ 751–753 (Comp. St. §§ 1259–1281), to inquire into the cause of and to discharge one confined under the process of a state court, who claims that he is held under the circumstances above stated, the time and method of the exercise of that power are within the wise judicial discretion of the court or judge, in view of the certainty or uncertainty with which the facts are established, in view of the nature of the case, of whether it involves an alleged violation of the Constitution or a confinement for an act done in pursuance of a law of the United States, of whether it is a case of urgency, where a failure to discharge the prisoner immediately will or may substantially delay the enforcement of the laws of the United States or seriously interfere with the operation of its government or the administration of its affairs, or it is a case which really involves only the question whether the issues presented shall first be tried in the federal or in the state court.

3. HABEAS CORPUS ⬅45(4)—FEDERAL COURTS—JURISDICTION.

If an officer or soldier of the United States is in custody under the process of a state court for an alleged offense against the laws of a state, for an act which he claims was done by him in his official capacity in pursuance of the laws of the United States, such as the shooting of a person he was trying to arrest, and at the close of the hearing under the writ of habeas corpus the facts are admitted or clearly proved, either that his confinement is in violation of the Constitution or of a law or treaty of the United States and that the state court is without jurisdiction to try him for the offense charged against him, or that he had authority from the United States to arrest persons guilty of the offense for whose commission he was trying to make an arrest, that he had reasonable cause to believe and did honestly believe that the person he sought was guilty of the offense for which he was trying to arrest him, that in attempting to make the arrest he acted within the scope of his authority and used no more force than he honestly and reasonably believed was necessary in order to make the arrest, and that the case is one

of urgency, in which the delay of a trial by the state court will seriously interfere with the enforcement of the laws of the United States or the operation of its government, the court or judge may and should immediately discharge the prisoner without waiting for such a trial.

But, if the case does not fall within one of the exceptional classes of cases above enumerated, the general rule and settled practice is for the court or judge to refuse to interfere by writ of habeas corpus with the custody of the state court until after the trial of the prisoner in that court, although it has the power and jurisdiction to discharge earlier.

4. ARREST ⬡⟿63(4)—FELONY—ARREST WITHOUT WARRANT.

While an officer may arrest for a felony without warrant he may not so arrest arbitrarily, and it is indispensable to a justification of arrest of one actually innocent, that the circumstances were such that a person of ordinary ability would have believed that the party was guilty.

5. HABEAS CORPUS ⬡⟿85(1)—EVIDENCE.

Where federal officers shot one of a party in attempting to arrest such persons in Osage county, Okl., for suspected violation of laws relating to intoxicating liquor, evidence *held*, in habeas corpus proceedings in the federal court, to show that none of the party, in the presence of the officers, committed the offense of introducing intoxicating liquor into the county.

6. INDIANS ⬡⟿38(5)—INTRODUCTION OF INTOXICATING LIQUORS.

The prima facie presumption of the unlawful introduction of intoxicating liquor into Indian Territory, etc., declared by Act May 18, 1916, § 1 (Comp. St. § 4144a), may be rebutted by evidence to the contrary.

7. HABEAS CORPUS ⬡⟿113(12)—APPEAL—PRESUMPTION.

It is a prima facie presumption of law that the finding of the trial judge in habeas corpus proceedings, who heard and saw the witnesses, was correct.

8. ARREST ⬡⟿68—FORCE.

Conceding that petitioners were authorized to arrest without warrant for introducing intoxicating liquor into Oklahoma, that authority includes the lawful power to use only such force as an ordinarily prudent and intelligent person, with knowledge and in situation of arresting officer, would have deemed necessary.

9. ARREST ⬡⟿68—FORCE—EXTENT.

Where federal officers desired to arrest several suspected of introducing intoxicating liquor into Oklahoma, *held* that, if persons were known to live in vicinity, etc., officers were not warranted in shooting into automobile in which such persons were riding, and taking the risk of, and actually killing, one of the party.

10. HABEAS CORPUS ⬡⟿111(1)—DISCHARGE—DISCRETION.

In a proceeding under Rev. St. §§ 751–753 (Comp. St. §§ 1279–1281), for habeas corpus to secure release of federal officials, who killed one whom they were attempting to arrest on theory he and his companions were guilty of introducing intoxicating liquor into Osage county, Okl., *held*, that refusal to discharge such officers from custody of state officials, to which they had been committed for violation of state law, was not an abuse of discretion.

Appeal from the District Court of the United States for the Western District of Oklahoma; John H. Cotteral, Judge.

Petitions by D. F. Castle and by Sam W. Tulk for writs of habeas corpus and for a discharge from the custody of Seth M. Lewis, Sheriff of Osage County, Okl. From judgments dismissing and denying the petitions, petitioners appeal. Affirmed.

⬡⟿For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

John A. Fain, U. S. Atty., of Lawton, Okl., and S. M. Rutherford, of Muskogee, Okl., for appellants.

T. J. Leahy and Corbett Cornett, both of Pawhuska, Okl. (C. S. Macdonald, of Pawhuska, Okl., on the brief), for appellee.

Before SANBORN, CARLAND, and STONE, Circuit Judges.

SANBORN, Circuit Judge. These are appeals from judgments of Hon. John H. Cotteral, United States District Judge, that the petitions of D. F. Castle and Sam W. Tulk, for writs of habeas corpus and for a discharge from the custody of Seth M. Lewis, sheriff of Osage county, Okl., be dismissed and denied.

An information was filed in the district court of Osage county by the county attorney of that county, which charged that Castle, Tulk, and William Bryant, on April 25, 1917, shot and murdered Charles Mosier. Castle and Tulk had been arrested and arraigned, had pleaded not guilty, and, in default of bonds of $5,000 each, fixed by the court, had been committed to the county jail in the custody of Lewis, the sheriff of the county. Thereupon Castle and Tulk presented to Judge Cotteral petitions for writs of habeas corpus, in which they alleged that they were on April 25, 1917, officers of the United States, duly authorized under the laws thereof to arrest persons for the offense of introducing whisky into Osage county, Okl., which was Indian country; that on that day Charles Mosier, Henry Mays, Roy Tinker, and Charles Roberts were engaged in transporting whisky in an automobile in the presence and within the knowledge of the petitioners into Osage county, which was Indian country, in violation of the laws of the United States; that the petitioners in the discharge of their official duty endeavored to arrest these violators of the law; that they called upon them to halt and to submit to arrest, but they refused and fled; that while they were fleeing the petitioners fired several shots from their guns at the departing automobile, to disable it, so that they could arrest its occupants; that they did not intend to shoot or injure Mosier; and that whatever acts they did were done in the discharge of their official duties as officers of the United States and by authority of its laws. Upon the filing of these petitions Judge Cotteral issued orders upon the sheriff to show cause why writs of habeas corpus should not be issued, and why Castle and Tulk should not be discharged from his custody. The sheriff answered that he held them under a commitment issued by the district court of Osage county, Okl., which commanded him to confine them in the county jail under the charge of murdering Mosier, until they should be legally discharged therefrom. Upon the presentation of this response the cases went to final hearing, testimony that occupies 107 pages of the printed record was introduced, and the court dismissed the petitions and refused to discharge the petitioners upon the merits of their cases.

[1] When a person is in custody under the process of a state court for an alleged offense against the laws of such state, and it is claimed (a) that he is in custody in violation of the Constitution, or of a law or treaty of the United States, or (b) for an act done or omit-

ted to be done by him in pursuance of a law of the United States, the District Courts of the United States and the judges thereof have plenary jurisdiction to inquire into the cause of such confinement by means of the writ of habeas corpus, and to discharge the petitioner if his detention is in violation of the Constitution or of a law or treaty of the United States, or if he is in custody for an act done or omitted to be done in pursuance of a law of the United States. United States Revised Statutes, §§ 751, 752, 753 (2 United States Compiled Statutes 1916, §§ 1279, 1280, 1281); Ex parte Royall, 117 U. S. 241, 248, 6 Sup. Ct. 734, 29 L. Ed. 868.

[2] It does not follow, however, from the grant of this jurisdiction, that the duty is imposed upon the court or its judges to discharge the petitioner in every case immediately after the hearing, even if the court or the judge is of the opinion that the confinement is unwarranted. The injunction of the statute is to hear each case on the writ of habeas corpus summarily and thereupon "to dispose of the party as law and justice may require." This direction leaves to the wise judicial discretion of the court, or judge, the time and mode in which the granted power shall be used. That discretion should be so exercised "in the light of the relations existing, under our system of government, between the judicial tribunals of the Union and of the states, and in recognition of the fact that the public good requires that those relations be not disturbed by unnecessary conflict between courts equally bound to guard and protect rights secured by the Constitution" (117 U. S. 251, 6 Sup. Ct. 740, 29 L. Ed. 868), in the light in each case, of the nature of that case, whether it involves an alleged violation of the Constitution or a confinement for an act done in pursuance of a law of the United States, whether it is a case of urgency where a failure to discharge the petitioner immediately will or may substantially delay the enforcement of the laws of the United States, or seriously interfere with the operation of its government or the administration of its affairs, or a case which really involves only the question whether the issues presented shall be first tried in the federal court or in the state court, and in the light of the clearness and certainty with which the material facts are established, whether they are admitted or proved beyond doubt, or are involved in uncertainty and the subject of conflicting testimony which naturally invokes the verdict of the jury.

[3] If an officer or soldier of the United States is in custody under the process of a state court for an alleged offense against the laws of a state for an act which he claims was done by him in his official capacity, in pursuance of the laws of the United States, such as the shooting of the person he was trying to arrest, and at the close of the hearing under the writ of habeas corpus the facts are admitted or clearly proved (a) that his confinement is in violation of the Constitution or of a law or treaty of the United States, and that the state court is without jurisdiction to try him for the offense charged against him (Ex parte Siebold, 100 U. S. 371, 376, 25 L. Ed. 717; In re Neagle, 135 U. S. 1, 10 Sup. Ct. 658, 34 L. Ed. 55; In re Waite [D. C.] 81 Fed. 359, 362, 371, 372; Campbell v. Waite, 88 Fed. 102,

107, 31 C. C. A. 403; In re Loney, 134 U. S. 372, 10 Sup. Ct. 584, 33 L. Ed. 949; In re Fair [C. C.] 100 Fed. 149), or (b) that he had authority from the United States to arrest persons guilty of the offense for whose commission he was trying to make an arrest, that he had reasonable cause to believe and did honestly believe that the person he shot was guilty of the offense for which he was trying to arrest him, that he acted in attempting to make the arrest within the scope of his authority and used no more force than he honestly and reasonably believed was necessary in order to make the arrest, and that the case is one of urgency in which the delay of a trial by the state court will seriously interfere with the enforcement of the laws of the United States or the operations of its government, the court or judge may and should immediately discharge the petitioner without waiting for such trial (Ohio v. Thomas, 173 U. S. 276, 283, 19 Sup. Ct. 453, 43 L. Ed. 699; United States v. Fuellhart [C. C.] 106 Fed. 911, 914; In re Laing [C. C.] 127 Fed. 213, 217; United States v. Lipsett [D. C.] 156 Fed. 65). The cases, however, which present such facts, are exceptional, and the general rule and settled practice of the courts and judges of the United States, in cases which do not fall within the classes just enumerated, is to so exercise their discretion, in view of the delicate relation of the national and the state courts, as to refuse to interfere by writ of habeas corpus with the custody of the state court, at least until after the trial of the petitioner therein. Ex parte Royall, 117 U. S. 241, 251, 6 Sup. Ct. 734, 29 L. Ed. 868; Drury v. Lewis, 200 U. S. 1, 6, 8, 26 Sup. Ct. 229, 50 L. Ed. 343; In re Lincoln, 202 U. S. 178, 181, 182, 26 Sup. Ct. 602, 50 L. Ed. 984, and cases there cited. The judge below, after hearing the evidence in the cases in hand, was of the opinion that they fell under the general rule, and in the exercise of his discretion he refused to discharge the petitioners before their trial in the state court, and the question now presented is: Was his action erroneous or an abuse of his discretion?

The only ground on which Castle and Tulk alleged in their petitions that they were entitled to a discharge from the custody of the state court was that they were officers of the United States, who had the authority under its laws, and upon whom the duty was imposed thereby, to arrest persons introducing whisky into Osage county in their presence, that Mays, Tinker, and Roberts were such persons, that the petitioners tried to arrest them, that they fled in an automobile, that it was necessary for the petitioners, in order to arrest the occupants of the automobile, to fire their guns at it, that they did so for that purpose, with no intent to shoot or injure its occupants, and that all their acts were done in their official capacity, in pursuance of the laws of the United States.

[4, 5] Conceding, without deciding, that the petitioners were authorized under the laws of the United States to arrest without a warrant persons who upon reasonable grounds they honestly believed were committing in their presence the offense of introducing intoxicating liquors into Osage county, that they tried to arrest Mays, Tinker, and Roberts as such persons, that the latter fled, and that the peti-

tioners fired at the automobile in which they went to stop it, so that the petitioners could make the arrest, the burden was still upon them to prove, by at least a fair preponderance of the testimony, three other facts, in order to entitle them to their discharge: First, that they had reasonable cause to believe and honestly did believe that Mays, Tinker, and Roberts were introducing intoxicating liquor into Osage county in their presence; second, that the petitioners honestly and with reason believed that, in order to arrest them therefor, it was necessary for the petitioners to fire their guns at the departing automobile which held them, and to take the chance of shooting its occupants; and, third, that the confinement the petitioners are suffering and will be likely to endure while their cases proceed to trial and disposition in the state courts will so seriously interfere with the enforcement of the laws of the United States or with the operations of its government that these are cases of emergency or urgency, which justify and require a departure from the general rule and a discharge of the petitioners before their trials in the state court.

Henry Mays was a livery driver, who lived at Pawhuska, in Osage county, with his wife and two children, owned his automobile, and carried passengers for hire. He had lived in Pawhuska for many years. Tinker was a young man 24 years old, who had lived in Pawhuska all his life, and was on April 25, 1917, a soldier. Mosier was a young soldier, who had lived in Pawhuska many years. Roberts was a young soldier. About 2 o'clock in the afternoon of the day of Mosier's death, he hired Mays to take himself, Tinker, and Roberts into the country. After they had been seated in the automobile, Mosier asked Mays to drive them to Charles Johnson's place, which was in Osage county, about nine miles east of Pawhuska. Mays did so. There Mosier and Tinker bought three quarts of whisky, and returned to the car, and Mays, Mosier, Tinker, and Roberts started therein back to Pawhuska. When they were about five miles east of their homes, they passed Lewis, the sheriff, and his car, which was on the road, and Castle, Tulk, and Bryant, who fired their guns at Mays' car and killed Mosier. Mays and the other occupants of his car did not go out of the county that day, and they were not introducing liquor into the county. Some time in the afternoon of that day Lewis had information that intoxicating liquors were expected into Osage county. He testified that he—

"just had information that there was a car of whisky coming in, probably two cars. Q. Didn't have any information as to who it was going to be? A. No, sir; I did not. I didn't know."

He told Castle and Tulk he had this information, and invited them to go in his automobile with him out on the Bartlesville road, which was the main travelled road east from Pawhuska, over which Mays had gone, and over which many automobiles passed daily, and over which intoxicating liquors were usually brought into Osage county. Lewis was, and had been for at least five years, acquainted with Mays, Mosier, and Tinker. Castle testified that he had known Mays for five years, that he had arrested him once for introducing liquor, that he had found liquor in his car, and that Mays had a reputation

of hauling liquor; but Mays testified that he had never been convicted of introducing liquor, and that he had not been hauling it. The officers went out on the Bartlesville road about four or five miles, and then, as Tulk testified:

"We laid in wait—got off into the lane there running north and south, and we laid in wait until we seen the car approaching."

They then took their car out onto the road, and as Mays' car approached they recognized Mays and his car, and as he passed them, and also after he passed them, they fired into the car, and after the car had gone a few rods past Lewis' car a shot struck and killed Mosier. The facts which have been recited thus far are undisputed. Some of the officers testify that as Mays' car approached them one of the occupants broke a bottle over the side of the car which they thought was whisky. The living occupants of Mays' car testified that no bottle was so broken before they passed the officers. Mays' car was running quite fast as it passed the car of Lewis, and Lewis' motor was also running. Mays testified that his brake was out of order, so that he could not have stopped quickly, if he had received notice to do so, but that he received no such notice. The officers testified that they held up their hands and called upon Mays to stop. The living occupants of Mays' car testified that they saw no motion and heard no call to stop, and that all they heard was a command from one of the officers as they passed, to kill them all, that Mosier then cried out, "For Christ's sake get out from here, they are going to kill us all," and Mays speeded up his car, and Mosier was shot.

The officers testified that none of them gave the command to kill; they also testified that they honestly believed that the occupants of Mays' car were introducing liquor into Osage county; and their counsel argue that they had reasonable ground for that belief, because the road on which Mays was driving was the road over which liquor was usually brought into the county, because the possession of intoxicating liquor in that county is prima facie evidence of its unlawful introduction (Act May 18, 1916, c. 125, § 1, 39 Stat. 124 [Compiled Statutes 1916, § 4144a]), and because some of them testified that they saw a bottle they thought contained whisky broken over the side of the car as it approached, and Lewis had information that one or two loads of whisky were coming into Osage county. But the fact is proved, without contradiction, that the occupants of Mays' car were not introducing liquor into Osage county. The alleged breaking of a bottle of liquor over the side of the car before it passed the officers is denied, and it is not established by the preponderance of the testimony. There is no evidence whatever who gave Lewis his information that liquors were to be introduced into the county, and he testified that he had no information that the occupants of Mays' car were expected to introduce it. If, therefore, his information justified the arrest of the occupants of Mays' car and the shooting into it, it would have equally justified the arrest of the occupants of any other car that happened first to come along the road at like speed with that of Mays' car, while these officers were lying

in wait. In Chandler v. Rutherford, 101 Fed. 774, 778, 43 C. C. A. 218, 221, this court, commenting on a similar situation said:

"It will be observed, however, that no offense had been committed in the deputy marshal's presence when he attempted to arrest the plaintiff, and that such knowledge as he had of an offense having been committed was derived wholly from hearsay. * * * When an officer seeks to justify an arrest without a warrant under a statute like the one now under consideration, and the act for which the arrest was made was not committed in his presence, it is manifest that he must show that he acted on information such as would justify a reasonable man in believing that the particular person arrested was guilty of a felony."

Section 5654 of the Revised Laws of Oklahoma of 1910, provides that a peace officer may, without a warrant, arrest a person:

"First. For a public offense committed * * * in his presence. * * * Third. When a felony has in fact been committed, and he has reasonable cause for believing the person arrested to have committed it."

The general rule is that, while an officer may arrest for a felony without a warrant under certain circumstances, he may not so arrest arbitrarily, or on a mere belief or suspicion that the party he arrests is guilty of the felony. It is indispensable to a justification, when the party he arrests or seeks to arrest is actually innocent, not only that the officer honestly believed or strongly suspected that the person he arrested or sought to arrest was guilty of the felony, but also that the facts and circumstances within his knowledge were such that a reasonable person of ordinary ability and intelligence, knowing those facts and circumstances and acting without prejudice or passion, would have believed or strongly suspected that the party arrested, or the party whom the officer sought to arrest, was either guilty of the felony or implicated in it. 5 Corpus Juris, 416, § 461, and notes and authorities there cited. In the case in hand the evidence is undisputed, not only that the occupants of Mays' car did not, in the presence of the officers, commit the offense of introducing liquor into Osage county, for which the petitioners alleged in their petition they were seeking to arrest them, but that they were not guilty of committing an offense at all.

[6, 7] The prima facie presumption of the introduction of the liquor which arose by virtue of the statute, which was enacted to throw the burden of proof upon the trial of cases for the introduction of the liquor upon those in possession of the liquor in the first instance, was met and swept away by the undisputed evidence of all of the witnesses upon the subject that Mosier and Tinker obtained the liquor on that day within the county, and that none of the occupants of the car introduced any from without it. The issue, whether or not, at the time of the attempted arrest and shooting, the officers had any knowledge that there was whisky in the car, is conditioned by conflicting testimony, the preponderance of which is not with the officers. In this state of the evidence the judge below failed to find that the facts and circumstances within the knowledge of the officers at the time of their attempted arrest and shooting were such that a reasonable person of ordinary intelligence and ability, knowing these facts and circumstances, would have been led to believe or

strongly to suspect that any of the occupants of Mays' car were guilty of the offense of introducing whisky into Osage county. There is a prima facie presumption of law that the finding of the judge who heard and saw the witnesses was correct, and a careful reading and consideration of the evidence has failed to satisfy that in making that finding the judge fell into any error of law or made any mistake of fact.

[8, 9] The next question is: Was there any error of law or mistake of fact, in that the judge failed to find under the evidence that the petitioners were acting within the scope of their authority in shooting into Mays' car and taking the chance of killing some of its occupants. Conceding, for the purpose of considering this issue only, that the petitioners were authorized to arrest the occupants of Mays' car without a warrant for the felony of introducing liquor into Osage county, that authority included the lawful power to use such force as they then had reasonable cause to believe, and in the exercise of their sound discretion they did honestly believe, was necessary to make the arrest; but it included the right to use no more, and the use of any greater force was beyond the scope of their authority, unauthorized, and without justification. Here, too, the measure of necessary force is that which an ordinarily prudent and intelligent person, with the knowledge and in the situation of the arresting officer, would have deemed necessary. 5 Corpus Juris, 424, § 59; 1 Bishop's New Criminal Procedure, § 159. The officers testified that as Mays' car approached them they raised their hands and called "Halt!" The living occupants of Mays' car testified that they saw no motion and heard no call to stop. The officers and occupants of Mays' car testified that the former fired the first shot into the side of Mays' car as it passed them; the living occupants of the car testified that as they passed all they heard was a command to kill them all as the shooting commenced. The officers testified no such command was given, but the witnesses agree that the shooting continued for some time after the car passed, and that from eight to twenty shots were fired. Several of these shots struck the automobile; some passed through the back of it above the seat; some passed over it, and struck in the road ahead of it, as it was going up a hill. The officers testified that they fired into the machinery below the body of the car and at the tires, for the purpose of stopping the car, and that they did not intend to injure the occupants.

The officers knew Mays, Mosier, and Tinker; they recognized them, or some of them, as Mays' car approached, and recognized that the car was Mays'; they knew that they lived in Pawhuska, toward which city they were going, and that they had lived there for many years. Mays was a married man, and had two children there. The occupants of Mays' car had no weapons, and had not resisted arrest; they testified they did not know that the officers wanted them to stop or wanted to arrest them until after the shooting. They were not fugitives from justice; they were not violent men; they were not itinerants or strangers. So it is that the evidence as to the sayings and doings of the parties when Mays' car passed the officers

presents a substantial conflict as to what was said and done by the officers, that invokes the consideration of a jury, and the facts that all the occupants of the car, except Roberts, were known by the officers to be settled residents and citizens of Pawhuska, and that they were going towards their homes there, whence the officers themselves came, render it difficult to conclude that a person of ordinary prudence and intelligence, knowing the facts and circumstances which these officers knew, could have had cause to believe, if he were in their situation, or could have honestly believed, that he could not have accomplished the arrest of the occupants of Mays' car in Pawhuska, which was only five miles away, or that it was necessary, in the exercise of sound discretion, in order to make their arrest, to fire into the automobile and take the dangerous chances of injuring or killing some of its occupants. The judge below was unable to reach that conclusion, and no error or mistake in his finding here is discovered.

[10] The single question remains: Was the judge below guilty of an abuse of his discretion in concluding that these were not such cases of urgency as required him to discharge the petitioners before their trial in the usual course of procedure in the state court? The contention that every case wherein an officer of the United States, in custody under an order of a state court for trial for an alleged offense against the laws of the state, claims that the act charged against him was as done or omitted by him while acting in his official capacity in pursuance of a law of the United States, is such a case of urgency as requires a federal court or judge to discharge the officer upon hearing of the writ of habeas corpus before his trial in the state court, is answered by the decision of the Supreme Court in Drury v. Lewis, 200 U. S. 1, 6, 8, 26 Sup. Ct. 229, 50 L. Ed. 343. The time and mode of disposing of such officers is subject to the discretion of the federal courts and judges.

The petitioners were committed to the custody of the sheriff on the charge of murder, and were so held in custody in default of bonds of $5,000 each, fixed by the state court. These facts constitute the only evidence or pleading that these were cases of urgency, that the enforcement of the laws of the United States or the operations of the national government would be injuriously delayed, or seriously or at all disturbed, by reason of their confinement, or the delay of their discharge until after their trials by juries in the regular course of the proceedings of the state court, and under these circumstances this court is unwilling to hold, in view of all the facts and circumstances to which reference has been made, that the judge below was guilty of any abuse of discretion in his refusal to discharge them before such trials.

Let the judgments and orders in these cases, which dismissed the writs of habeas corpus and denied the applications for the discharge of the petitioners from the custody of the sheriff, be affirmed, with costs.