**BROWN, Boatswain's Mate, v. CAIN, Warden.**

No. M–1075.

District Court, E. D. Pennsylvania.

June 14, 1944.

R. Paul Lessy, Asst. Dist. Atty., of Chester, Pa., and William R. Toal, First Asst. Dist. Atty., and C. William Kraft, Jr., Dist. Atty., both of Media, Pa., for the State of Pennsylvania.

John Diggins, of Chester, Pa., for relator.

Gerald A. Gleeson, U. S. Atty., and J. Barton Rettew, Jr., Asst. U. S. Atty., both of Philadelphia, Pa., for the Government.

KIRKPATRICK, District Judge.

The relator James H. Brown, a guard, shot and killed a man named Franklin Giddings in the shipyard of the Sun Shipbuilding Dry Dock Co. at Chester, Pennsylvania. He was arrested, indicted by the Grand Jury of Delaware County for murder and was in the custody of the respondent, the warden of the County prison.

He applied for this writ, alleging that he was in custody for an act done in pursuance of a law of the United States, Title 28, Sec. 453, U.S.C.A.

The relator has been since December 21, 1942, an enrolled temporary member of the Coast Guard Reserve, with the rating of Boatswain's Mate, First Class. As such he was a member of the Armed Forces of the United States.

On June 16, 1943, he was on guard duty in the No. 4 yard of the Sun Shipbuilding plant and was at that time in charge of the Coast Guard detail in the area consisting of some 20 enlisted men.

The United States was at war and the Sun Company was engaged in building ships for the government. Brown's duties included suppression of disturbances which might cause damage to machinery and equipment or affect the security of the plant. It follows, and I so find, that any act done by Brown which was reasonably necessary to quell a riot in the area under his charge was done in performance of his duty as a member of the Armed Forces, and hence in pursuance of the law of the United States.

The principles governing the jurisdiction and the discretion of this Court upon habeas corpus proceedings in cases of this kind (specifically cases of government officers charged with killing in the course of making an arrest) may be stated as follows:

The first question is, was the act for which the relator is held, an act done in pursuance of the law of the United States? The answer does not depend upon guilt or innocence of the relator or his amenability to State law had he not been a government officer, but solely upon whether he had authority from the United States to arrest persons guilty of the offense for the commission of which he was trying to make the arrest, whether he had reasonable cause to believe and did honestly believe that the person he shot was guilty of the offense for which he was trying to arrest him, and whether, in attempting to make the arrest he acted within the scope of his authority and used no more force than he honestly and reasonably believed was necessary. Castle v. Lewis, 8 Cir., 254 F. 917. The bare facts that the relator was an officer of the United States authorized to make arrests and shot in the course of making an arrest will not afford him immunity from prosecution under the laws of the State. In re Waite, D.C., 81 F. 359, 363. If he acted wantonly with a criminal intent, then he was not acting in the pursuance of law of the United States. In re Fair, C.C., 100 F. 149. The inquiry must, therefore, be as to the honesty of the relator's belief that the arrest was justified and that the shooting was reasonably necessary to accomplish it. As in all cases where intent is involved, all the surrounding circumstances must be considered, because if they were such that no reasonable man could believe it necessary to shoot to make the arrest, the relator's testimony as to his motives and belief would have to be disregarded.

The next principle to have in mind is that it is not sufficient that the judge

weighing all the testimony comes to the conclusion that the act was in line of duty, necessary and, therefore, in pursuance of the law of the United States. Facts pointing to that conclusion, must be either admitted or uncontradicted or, at least, supported by so great a preponderance of evidence that a reasonable mind construing it can hardly come to any other conclusion. Regardless of the conclusion which the judge himself might reach, if there is a substantial conflict of evidence as to basic or controlling facts the Federal Court should refuse to exercise its discretion to release the relator and should remand him to the custody of the State authorities for trial by the State Court. Drury v. Lewis, 200 U.S. 1, 26 S.Ct. 229, 50 L.Ed. 343.

 Lastly, the discretion of the Federal Court is limited by the nature of the occasion upon which its power is invoked. Even though it be clearly proved that the act for which the relator is held was the act of a government officer in pursuance of a law of the United States, he should be remanded to the State Court for trial unless the case is one of urgency where the failure to discharge the prisoner will or may substantially delay the enforcement of the laws of the United States, or seriously interfere with the operation of its government or the administration of its affairs. Castle v. Lewis, supra; Ex parte Royall, 117 U.S. 241, 6 S.Ct. 734, 29 L.Ed. 868.

This brings us to the facts of the case. They are covered in detail in answers to requests, and only the essential ones need be stated.

A riot was in progress. A crowd had collected when Brown, properly, had taken into custody a workman who had refused to show his identification badge. That incident had terminated, but the crowd, instead of dispersing, followed Brown and three other coast guards along a road between two buildings of the plant, demanding satisfaction of some kind for what one or two of their leaders, without the slightest justification, insisted was "rough handling" of the man. The crowd was rapidly growing in size and its demeanor was menacing. A number of the men were carrying tools, monkey wrenches and long-bladed electricians' knives, any of which could easily be a deadly weapon. They were, as one witness described, "hollering, whooping and screaming." Their language was foul, abusive and threatening. Altogether it was unquestionably an unruly and potentially dangerous mob.

At a point where another street or lane opened into the road on which the guards were slowly retreating before the crowd, Brown and one of the others made a sort of stand in order to permit a third guard named Hampton, who seemed to be a special object of ill will, to escape. The crowd moved forward beginning to surround the two guards. One of its leaders laid hands on Brown and whirled him around. Others got hold of the other guard's revolver and tried to get it away from him.

Brown had just managed to get himself out of the crowd when someone threw a half brick which struck him in the back of the head and at the same moment he saw Giddings run down the side street and away from him and the crowd. Believing, whether rightly or wrongly, that this was the person who had thrown the brick, Brown called out, "Come back here. I saw you," ordered him to halt, and then fired one or two shots in the air. At the first shot one of the leaders of the crowd shouted: "Let's rush him; the sons-of-bitches only got blanks; let's get them." Giddings continued to run and Brown, after calling to him a third time to halt, fired again, aiming low in order to hit him in the leg. Just at the moment, however, Giddings stumbled and, when hit, was in an almost prone position, so that the bullet striking him in the buttocks, took a course through his abdomen and inflicted a fatal wound.

As bearing upon the necessity of the shooting, Brown's testimony in addition to the circumstances already described, is to be considered. He said: "I was determined to see that the man was apprehended * * *. Because he was the man who committed the first overt act. After he did that other missiles were thrown and in order to quell a riot I have always been instructed to apprehend the leaders. * * * I felt that to apprehend that man was absolutely necessary in order to quell the riot."

 I find that the relator, acting in the course of his duty, was trying to make an arrest, that he had reasonable cause to believe and did honestly believe that the arrest was necessary to the performance of his duty in quelling a riot, and that his

use of the weapon was reasonably necessary in order to make the arrest.

Brown was standing on a pile of steel or plates when he fired. Whether he could have caught the man by running after him is doubtful, but, had he attempted to do so, he would have been compelled to desert the other guards with the riot in full progress. Careful weighing of consequences and deliberate choice between various possible courses of action in situations such as that in which Brown found himself are impossibilities and not to be required. It is sufficient if he acted in good faith, to the best of his judgment for a proper purpose. Whether he was right or wrong I find as a fact that he did not act wantonly nor with criminal intent.

■ Though there is disagreement among witnesses called by the relator and the respondent as to many details of the occurrence above described, there is really hardly any conflict of testimony upon the essential points upon which findings of fact have been made. Several of the respondent's witnesses testified that they did not see wrenches and knives brandished by the crowd, although no one denied that many of the men had such tools in their hands. There was also negative testimony from which it might be inferred that the crowd was, if not orderly, at least not disposed to violence. This testimony, however, is largely to the effect that the witness called did not see certain incidents and acts of violence or did not hear certain threats and abusive utterances described by the relator's witnesses. This kind of evidence is not sufficient to create a substantial conflict, particularly if one remembers that the mob consisted of 500 to 600 men crowded in a roadway between two buildings and that many occurrences might not have been seen by everyone. It is not even necessary to find that these witnesses were not telling the truth as to what they themselves saw or heard in order to reach the conclusions which I have reached.

It is highly significant that, among 38 requests for findings of fact presented by the respondent, there is no one which asks the Court to find that there was no riot in progress or that the crowd was orderly or that the guards were not cursed, abused, threatened and laid hold of, or that a brick was not thrown.

From all the evidence no conclusions are possible other than that Brown had every reason to believe that he and the other guards were faced with the duty of putting down a riot of major proportions and that he and the others were in a position of real and immediate danger of life and limb.

■ The only point at which there is a sharp and entirely irreconcilable conflict of testimony is the question whether Giddings was the person who threw the brick. I make no finding upon this point because I think it is immaterial. Brown undoubtedly thought that he was the man. His conclusion was based upon what he saw and, upon that, he was fully justified in his effort to arrest Giddings. The Courts have said more than once that mistake of judgment does not deprive the relator of the protection to which he is entitled in the performance of his duty and in pursuance of the law of the United States.

The facts in Drury v. Lewis, supra [200 U.S. 1, 26 S.Ct. 230, 50 L.Ed. 343], the case which called forth the ruling that it was for the State Court to resolve conflicts of testimony, present an entirely different picture. In that case, which was a shooting by a soldier in the course of an arrest, at least three witnesses testified squarely that the man who was killed had stopped, had turned around facing his pursuer, had thrown up his hands and said, "I will give up," before the shot was fired. In the present case there is, in fact, remarkable unanimity on the part of the witnesses as to the actual pursuit and shooting of Giddings.

■ Lastly, I am of the opinion that the case is one in which the interposition of the Federal Court by habeas corpus is fully justified. I shall not attempt to fit it into the exact language of all of the decisions—"extraordinary," "peculiar urgency," "of exceptional nature," etc. I have no doubt that a guard in the service of the United States, protecting the plant of a vital war industry, who, in the performance of his duty, does an act for which the State authorities propose to prosecute him, should be held amenable to the law of the United States and to no other.

An order will be entered discharging the relator from the custody of the respondent. Inasmuch as he has already been tried by Naval court-martial and acquitted he will also be discharged from the custody of this Court.