**Petition of Lloyd CLIFTON for a Writ of Habeas Corpus, Petitioner-Appellee,**

**v.**

**Gene COX, Sheriff of Humboldt County, California, Respondent-Appellant.**

**No. 75–1585.**

United States Court of Appeals, Ninth Circuit.

March 4, 1977.

William F. Ferroggiaro, Jr., argued, John E. Buffington, Dist. Atty., Eureka, Cal., for respondent-appellant.

James L. Browning, Jr., U. S. Atty., argued, San Francisco, Cal., James R. McKittrick, argued, Matthews, Traverse & McKittrick, Eureka, Cal., for petitioner-appellee.

Evelle J. Younger, Atty. Gen. of California, San Francisco, Cal., for amicus curiae.

Before BROWNING, MERRILL and LAY,* Circuit Judges.

OPINION

LAY, Circuit Judge:

The United States District Court for the Northern District of California, the Honorable Samuel Conti presiding, granted petitioner Lloyd Clifton a writ of habeas corpus discharging him from the constructive custody of the respondent Gene Cox, Sheriff of Humboldt County, California, and the State of California. It permanently stayed all state criminal proceedings arising from an indictment charging Clifton with second degree murder and involuntary manslaughter for the shooting of Dirk Dickenson on April 4, 1972, while Clifton was serving as a special agent for the Bureau of Narcotics and Dangerous Drugs (BNDD) in the United States Department of Justice.[1] Respondent Cox appeals.[2] We affirm the grant of the writ.

* The Honorable Donald P. Lay, United States Circuit Judge for the Eighth Circuit, sitting by designation.

1. The Bureau of Narcotics and Dangerous Drugs (BNDD) in the United States Department of Justice was abolished by Reorg. Plan No. 2 of 1973, eff. July 1, 1973. That plan also created a comprehensive agency for the enforcement of drug laws to be known as the Drug Enforcement Administration.

2. The People of the State of California filed a brief as amicus curiae in support of respondent. The petitioner was represented by the United States Attorney was well as private counsel.

## I

The district court held an evidentiary hearing, lasting three days, and found the following facts.

Petitioner was a member of a task force from various federal and state agencies which secured a federal search warrant authorizing a search of a ranch near Garberville, California, the alleged location of an illegal drug manufacturing operation. The task force also obtained a federal arrest warrant for Dirk Dickenson, one of the record owners of the property. A United States Army helicopter transported the task force to the raid site on April 4, 1972. It landed in front of the cabin raising a considerable amount of dust and debris and creating a lot of noise. During the commotion as the raiders debarked one agent (Agent Filben) outran his feet and fell to the ground. Clifton, thinking that Filben had been shot, rushed the cabin and kicked in the door. He did not knock, identify himself, nor announce his authority and purpose before making his forceful entry.

As Clifton entered the front door, Dickenson jumped over a bannister into the backyard and began running towards a nearby wooded area. Clifton leveled his pistol at the running figure, called "Halt," waited a few seconds, called "Halt" again, waited a second or two and then fired. The bullet entered Dickenson's back and he died en route to the hospital. Dickenson was unarmed and offered no physical resistance other than flight.

Clifton was indicted in the state court for second degree murder and involuntary manslaughter. He subsequently petitioned the federal district court for a writ of habeas corpus and release from state custody.

On the basis of the above facts the federal district court found that petitioner honestly and reasonably believed that: (1) the fleeing suspect was Dirk Dickenson, the individual named in the arrest warrant for felony violations of federal drug laws; (2) the fleeing suspect had just shot a fellow officer (Agent Filben); (3) the fleeing suspect was potentially armed and dangerous, and his successful entry into the woods would pose a danger to the lives of the pursuing officers. The district court granted a writ of habeas corpus under 28 U.S.C. § 2241(c)(2), which provides in part:

(c) The writ of habeas corpus shall not extend to a prisoner unless—

. . . . .

(2) He is in custody for an act done or omitted in pursuance of an Act of Congress, or an order, process, judgment or decree of a court or judge of the United States; . . .

On appeal respondent urges that the district court erred in not requiring Clifton to stand trial on the state criminal charges for the following reasons: (1) material facts relating to the shooting incident were in conflict; (2) the district court should have given evidentiary value to the BNDD regulations requiring its officers to use weapons only in self-defense; and (3) there was no showing of "urgency."

## II

The landmark decision governing petitioner's rights is *In re Neagle*, 135 U.S. 1, 10 S.Ct. 658, 34 L.Ed. 55 (1890).[3] There the Supreme Court of the United States recog-

---

**3.** The case of *In re Neagle*, 135 U.S. 1, 10 S.Ct. 658, 34 L.Ed. 55 (1890), involved an assault upon a Justice of the United States Supreme Court. Neagle, a United States Deputy Marshal, was assigned to protect Mr. Justice Stephen J. Field. It was anticipated that one David S. Terry would attempt to take the Justice's life because of his involvement in a civil suit where Terry was held in contempt. Terry made frequent and vindictive denunciations against Mr. Justice Field and publicly threatened to kill him. On the day in question Mr. Justice Field and Neagle were eating breakfast when Terry entered the room and struck the Justice twice. In the ensuing struggle Terry thrust his hand in his coat and Neagle believed that he was going to draw a knife. Neagle fired two shots and killed Terry. In fact, Terry was not carrying a knife.

The Supreme Court affirmed the lower court's discharge of Neagle from state custody on the ground that he did no more than was necessary and proper in performing an act which he was authorized to do by the law of the United States.

nized, by reason of the Supremacy Clause, U.S.Const. art. VI, that a federal officer cannot be held on a state criminal charge where the alleged crime arose during the performance of his federal duties. The Court held:

> To the objection, made in argument, that the prisoner is discharged by this writ from the power of the state court to try him for the whole offence, the reply is that if the prisoner is held in the state court to answer for an act which he was authorized to do by the law of the United States, which it was his duty to do as marshal of the United States, and, if, in doing that act, he did no more than what was necessary and proper for him to do, he *cannot* be guilty of a crime under the law of the state of California. When these things are shown, it is established that he is innocent of any crime against the laws of the state, or of any other authority, whatever.

135 U.S. at 75, 10 S.Ct. at 672.

Sixteen years later the Supreme Court reviewed the principles enunciated in its *Neagle* opinion. *See United States ex rel. Drury v. Lewis*, 200 U.S. 1, 26 S.Ct. 229, 50 L.Ed. 343 (1906).[4] In *Drury*, however, the Court denied release of a federal officer from state custody repeating the warning that in discharging an individual under state court indictment the federal courts

are exercising an extremely delicate jurisdiction. *See Baker v. Grice*, 169 U.S. 284, 291, 18 S.Ct. 323, 42 L.Ed. 748 (1898). The Court said:

> We have repeatedly held that the acts of Congress in relation to *habeas corpus* do not imperatively require the circuit courts to wrest petitioners from the custody of state officers in advance of trial in the state courts, and that those courts may decline to discharge in the proper exercise of discretion.

200 U.S. at 8, 26 S.Ct. at 232.

The Supreme Court has not reviewed the *Neagle* rule in the 70 years since *Drury*.[5] The last reported circuit court opinion was in 1929. *See Birsch v. Tumbleson*, 31 F.2d 811 (4th Cir. 1929). *See also Castle v. Lewis*, 254 F. 917 (8th Cir. 1918); *West Virginia v. Laing*, 133 F. 887 (4th Cir. 1904).

### III

Respondent contends that the principles of abstention expressed in *Drury, supra*, should control because there is conflicting evidence as to whether petitioner's conduct was actually necessary and proper. He alleges that the entry into the cabin was adjudicated by Judge William T. Swiegert to be in violation of 18 U.S.C. § 3109;[6] that, contrary to the district court's findings, there was evidence that there was nothing to identify the raiders as law en-

---

4. In *United States ex rel. Drury v. Lewis*, 200 U.S. 1, 26 S.Ct. 229, 50 L.Ed. 343 (1906), a military officer shot a man who was, according to the officer's testimony, attempting to escape arrest after allegedly committing a felony. There was a conflict as to whether the felon had surrendered at the time he was shot and it was conceded that if the deceased was not a fleeing felon the ground for federal interposition failed. The Supreme Court upheld the denial of the writ of habeas corpus rejecting the officer's claim that the state lacked jurisdiction to try him for the criminal offense. The Court held that the federal officer was free to present his claim that he was carrying out federal duties as a defense in the state court. In view of the conflicting evidence as to whether the victim had already surrendered when he was shot, however, the Court decided the issue as to whether the officer did nothing more than what was necessary and proper was a question of fact for the jury.

5. The scope of the writ of habeas corpus, insofar as the statutory language is concerned, has not been altered since 1867. The specific provision involved here, allowing the challenge of state detention of a person for an act done pursuant to federal authority, was the result of state imprisonment of federal marshals seeking to enforce the controversial Tariff Act in 1833. As has been noted, removal statutes 28 U.S.C. §§ 1442 and 1442(a), which now allow a federal officer to remove a state charge to federal court for trial, may account for the infrequency of this type of habeas corpus litigation. *See* C. Wright *Federal Courts* 209–10 and n. 10 (2d ed. 1970).

6. *United States v. Arnold*, No. 72–479 (N.D. Cal., filed October 18, 1972).

forcement officers; that Judith Arnold (Dickenson's companion) testified, contrary to the district court's findings, that Dickinson did not flee until *after* petitioner kicked in the door; that petitioner acted in violation of his departmental regulations in firing a shot at Dickenson;[7] and that the use of the United States Army helicopter and crew was in violation of federal law.[8]

Respondent urges that Clifton's use of physical force exceeded the "exigency of the process" under which he acted. Quoting from *In re McShane,* 235 F.Supp. 262 (N.D.Miss.1964), he argues that:

[t]he statutory habeas corpus provision for the benefit of federal officers was not intended to place beyond the reach of a state's criminal law federal officials *who employ means which they cannot honestly consider reasonable in discharging their duties or who otherwise act out of malice or with some criminal intent.*

*Id.* at 273.

We turn to those contentions.

*Scope of Authority.*

With the exception of the conflicting evidence relating to the identity of the raiders and timing of Dickenson's flight, the factors relied upon by respondent relate to the question of whether the act for which petitioner is held was done pursuant to a law of the United States and in the line of duty. The legality of the search warrant, the manner of its execution, the authority to use an Army helicopter and compliance with the BNDD regulations all relate to the scope of petitioner's authority. The issue of petitioner's scope of authority presents a question of law which we find was properly resolved by the district court.

■ It is well-settled that a federal official cannot be held personally liable in a civil suit for acts committed within the outer perimeter of his line of duty. *See Barr v. Matteo,* 360 U.S. 564, 79 S.Ct. 1335, 3 L.Ed.2d 1434 (1959). "To be within that perimeter, and therefore absolutely privileged, '[I]t is only necessary that the action bear some reasonable relation to and connection with the duties and responsibilities of the official.'" *Scherer v. Morrow,* 401 F.2d 204, 205 (7th Cir. 1968), *cert. denied,* 393 U.S. 1084, 89 S.Ct. 868, 21 L.Ed.2d 777 (1969), quoting from *Scherer v. Brennan,* 379 F.2d 609, 611 (7th Cir.), *cert. denied,* 389 U.S. 1021, 88 S.Ct. 592, 19 L.Ed.2d 666 (1967).

The Supreme Court in *Barr v. Matteo, supra,* gives approval to the test propounded by Judge Learned Hand in *Gregoire v. Biddle,* 177 F.2d 579, 581 (2d Cir. 1949), *cert. denied,* 339 U.S. 949, 70 S.Ct. 803, 94 L.Ed. 1363 (1950):

What is meant by saying that the officer must be acting within his power cannot be more than that the occasion must be such as would have justified the act, if he had been using his power for any of the purposes on whose account it was vested in him. . . .

360 U.S. at 572, 79 S.Ct. at 1340.

The Court concludes that the fact that a petitioner is not *required* by law or by direction of his superiors to act as he did is *not* controlling because "the same consider-

---

**7.** BNDD regulations which were in effect on April 4, 1972, provided:

An agent will not shoot at any person except to protect his own life or that of some other person.

Agents will not fire at fleeing suspects or fleeing defendants, agents will not fire at a fleeing automobile being used simply as a means of escape.

The firing of warning shots is prohibited. Agents will not remain passive in a threatening situation. However, the agent will ensure that he has made an accurate assessment of the situation in considering the use of firearms.

Firearms will not be utilized to coerce or intimidate suspects or defendants who are not threatening an agent or another person. *Internal Regulations, Bureau of Narcotics and Dangerous Drugs,* December, 1971.

**8.** 18 U.S.C. § 1385 provides:

Whoever, except in cases and under circumstances expressly authorized by the Constitution or Act of Congress, willfully uses any part of the Army or the Air Force as a posse comitatus or otherwise to execute the laws shall be fined not more than $10,000 or imprisoned not more than two years, or both.

ations which underlie the recognition of the privilege as to acts done in connection with a mandatory duty apply with equal force to discretionary acts at those levels of government where the concept of duty encompasses the sound exercise of discretionary authority." *Id.* at 575, 79 S.Ct. at 1341.

■ The same concepts have been applied in examining allegations of criminal conduct of federal officials. *Cf. Calley v. Callaway*, 519 F.2d 184, 193 (5th Cir. 1975); *Montana v. Christopher*, 345 F.Supp. 60 (D.Mont.1972). In two early decisions, notwithstanding the questionable legality of a federal officer's actions, courts recognized the general rule that errors of judgment in what one conceives to be his legal duty will not, alone, serve to create criminal responsibility of a federal officer.

The decision of *In re Fair*, 100 F. 149 (D.Neb.1900), presents facts analogous to those here. In that case two infantry privates were ordered by their superior to pursue escaping prisoners, to attempt to halt them by shouting "Halt" twice, and to shoot if the halt orders were disobeyed. Following these orders, the petitioner shot and killed one of the prison escapees, and the State of Nebraska instituted criminal charges. There was some question as to whether the order to shoot was properly given in light of Infantry Regulations, but the court found that it was properly obeyed and granted habeas relief.[9]

Similarly in the case of *In re Lewis*, 83 F. 159 (D.Wash.1897), special employees of the United States Treasury Department and a United States Deputy Marshal *wrongfully* seized some private papers while executing a search warrant. The state brought robbery charges against them, but the district court granted a writ of habeas corpus.[10]

**9.** In discussing scope of authority in *In re Fair*, 100 F. 149 (D.Neb.1900), Judge Munger said:

The evidence in this case shows that petitioners acted entirely without malice; that the conditions existing at the place and time of the shooting were such as to cause an honest belief on their part that Morgan would, in all probability, effect his escape unless disabled; that they did not shoot with a purpose of killing, but only to disable. I am mindful of the rule of law that in a habeas corpus proceeding the court will not examine the evidence for the purpose of determining whether the party should be pronounced guilty or innocent of the offense for which he is imprisoned; yet in a case of this character it is not only proper, but necessary, for the court to determine whether the parties acted wantonly and with criminal intent, or whether their acts, though wrongful, were errors of judgment only. If they acted wantonly, with a criminal intent, then they were not acting within the scope of the authority conferred by the laws of the United States. On the other hand, if they acted without any criminal intent, but in an honest belief that they were only discharging the duties of a soldier, then their offense, if offense it was, was not against the laws of the state, and in such case the state has no jurisdiction.

*Id.* at 155.

This language is similar to that used in the more recent cases discussing civil liability of state officials under the federal civil rights acts. In *Pierson v. Ray*, 386 U.S. 547, 87 S.Ct. 1213, 18 L.Ed.2d 288 (1967), the Supreme Court reaffirmed the prevailing view that police officers "should not be liable if they acted in good faith and with probable cause in making an arrest under a statute that they believed to be valid." *Id.* at 555, 87 S.Ct. at 1218. Similarly, in *Scheuer v. Rhodes*, 416 U.S. 232, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974), the Court held:

It is the existence of reasonable grounds for the belief formed at the time and in light of all the circumstances, coupled with good-faith belief, that affords a basis for qualified immunity of executive officers for acts performed in the course of official conduct. *Id.* at 247–48, 94 S.Ct. at 1692.

**10.** In granting a writ of habeas corpus in *In re Lewis*, 83 F. 159 (D.Wash.1897), Judge Hanford observed:

In deciding this case, I do not mean to say that the warrant which Mr. Kiefer issued was a lawful warrant, nor that the proceedings under it were proper proceedings. I do not mean to say that the petitioners were lawfully discharging their official duties in what they did. In my opinion, the warrant itself was improvidently and erroneously issued, and the proceedings were all ill-advised, and conducted with bad judgment. But where an officer, from excess of zeal or misinformation, or lack of good judgment in the performance of what he conceives to be his duties as an officer, in fact transcends his authority, and invades the rights of individuals, he is answerable to the government or power under whose appointment he is acting, and may also lay himself liable to answer to a private individual who is injured or oppressed by his action; yet where there is no criminal intent on his part he does not become liable to answer to the criminal process

■ Here petitioner, as a duly appointed and acting federal narcotics agent, was empowered to carry firearms and to execute search warrants under federal law. *See* 21 U.S.C. § 878.[11] We conclude that even though his acts may have exceeded his express authority, this did not necessarily strip petitioner of his lawful power to act under the scope of authority given to him under the laws of the United States.[12]

■ In so holding, we do not mean to imply that the exercise of authority in and of itself places a federal officer beyond the reach of a state's criminal process. The significant question of whether the conduct was necessary and proper under the circumstances must still be answered. Essential to this determination, assuming the truth of the state's evidence, is whether the official employs means which he cannot honestly consider reasonable in discharging his duties or otherwise acts out of malice or with some criminal intent. *See In re McShane, supra*, 235 F.Supp. at 273.

*Necessary and Proper Standard.*

This brings us to the state's contention that there was conflicting evidence concerning the identification of the raiders[13] and as to when Dickenson took flight.[14] The resolution of these factual conflicts, however, is immaterial to the resolution of the ultimate issue of whether petitioner employed means which he could consider reasonable in the discharge of his duty.

■ Determination of whether petitioner's shooting of Dickenson was necessary and proper, we find, must rest not only on the subjective belief of the officer but also on the objective finding that his conduct may be said to be reasonable under the existing circumstances. Proper application of this standard does not require a petitioner to show that his action was in fact necessary or in retrospect justifiable, only that he reasonably thought it to be. Thus, in *In re Neagle, supra*, the officer killed Terry (the alleged assailant) when he reasonably thought that Terry was reaching for a knife. It was later learned that Terry was not carrying a knife, but Neagle was discharged from state custody because the Court believed his act to be necessary and proper in the performance of his duty. 135 U.S. at 76, 10 S.Ct. 658.

Subsequent cases also indicate that the appropriate test does have an element of subjectivity: "The inquiry must, therefore, be as to the honesty of the relator's belief that the arrest was justified and that the shooting was reasonably necessary to accomplish it." *Brown v. Cain*, 56 F.Supp. 56,

of a different government. With our complex system of government, state and national, we would be in an intolerable condition if the state could put in force its criminal laws to discipline United States officers for the manner in which they discharge their duties. Or, take it the other way, if the government of the United States should prosecute as criminals sheriffs and other ministerial officers, justices of the peace, and judges of superior courts for errors of judgment, or ignorance, causing blunders in the discharge of their duties, it would bring on a condition of chaos in a short time.

*Id.* at 160.

11. 21 U.S.C. § 878 provides, in part:

Any officer or employee of the Bureau of Narcotics and Dangerous Drugs designated by the Attorney General may—

(1) carry firearms;

(2) execute and serve search warrants, arrest warrants . . . issued under the authority of the United States; . . .

12. The phrase "scope of authority" is most frequently used in connection with the law of agency in civil cases. In those cases it is generally not necessary to show that an employer has authorized or permitted the employee's particular act as long as that act occurred in the scope of the employee's regular duties and employment. *See generally* Restatement (Second) of Agency §§ 228–49.

13. As to the raisers' identity the district court found there could be "no reasonable dispute that these individuals . . . were law enforcement officers; indeed, it strains the imagination to conclude otherwise." *In re Clifton*, No. C–74–1549 SC (N.D.Cal., filed Sept. 25, 1974) at 7.

14. The determination of whether petitioner entered the cabin before or after Dickenson fled goes only to the question of whether there were exigent circumstances justifying that entry. The fact remains that Dickenson did attempt to flee and that Clifton shot him in pursuit.

58 (E.D.Pa.1944); "If . . . petitioner *shows . . . that he had an honest and reasonable belief that what he did was necessary in the performance of his duty . . then he is entitled to the relief he seeks."* In re McShane, supra, 235 F.Supp. at 274.

■ Here petitioner had an arrest warrant for Dickenson and thereby had the right and the duty to arrest him whether he cooperated or not. As petitioner made his way to the cabin in the swirl of debris caused by the helicopter blades, attempting to execute the warrants, he heard noises which sounded like gunshots and he simultaneously observed a fellow officer fall abruptly to the ground. Petitioner had been informed that the suspects might be armed and dangerous and he proceeded with the belief that an agent had been shot. He subsequently observed Dickenson fleeing to a wooded area.

The district court observed:

In view of these facts, undisputed on the record, and in view of the earlier discussed belief by petitioner that the occupants of the cabin were potentially armed and dangerous, this court concludes the petitioner's belief that Dickenson had shot Agent Filben was both honest and reasonable.

*In re Clifton*, No. C–74–1549 SC (N.D.Cal., filed Sept. 25, 1974) at 7.

The court also concluded that petitioner's belief that Dickenson's escape into the woods would pose a danger to the lives of the pursuing officers was honest and reasonable. We cannot on the basis of the overall record conclude that these findings are clearly erroneous.

## IV

■ We come to the state's final contention. Relying on language from *Brown v. Cain, supra,* the state argues that since

petitioner has not been suspended from his federal service position, there is no urgency requiring the grant of habeas relief. The district court in *Brown* stated that the government officer should be remanded to the state court for trial "unless the case is one of urgency where the failure to discharge the prisoner will or may substantially delay the enforcement of the laws of the United States, or seriously interfere with the operation of its government or the administration of its affairs." 56 F.Supp. at 59.

In rejecting this contention the district court here relied on the observation made in *In re McShane, supra:*

This contention is in disregard of the long standing authority that sufficient urgency is shown whenever it is made to appear that a federal officer is detained on charges of violating state law because of acts committed in the performance of his official duties. Not only would the trial itself keep petitioner from the discharge of his responsibilities in Washington, but considerations basic to our federal system precludes subjecting to state scrutiny conduct which is within the scope of petitioner's official duties as a United States marshal.

235 F.Supp. at 274 n.13.

The major issue here does indeed involve a delicate question of federal-state relationships. The general notion underlying these questions is that under ordinary circumstances a federal court should not interfere with state court actions where the state is seeking to enforce its own laws. *See Younger v. Harris,* 401 U.S. 37, 91 S.Ct. 746, 27 L.Ed.2d 669 (1971). However, the situation involved here is easily distinguished from those cases requiring federal abstention. In the *Younger* line of cases [15] a petitioner seeks to avoid prosecution under a state criminal statute by challenging the

---

**15.** In addition to *Younger v. Harris,* 401 U.S. 37, 91 S.Ct. 746, 27 L.Ed.2d 669 (1971), the federal abstention doctrines are discussed in *Hicks v. Miranda,* 422 U.S. 332, 95 S.Ct. 2281, 45 L.Ed.2d 223 (1975); *Samuels v. Mackell,* 401 U.S. 66, 91 S.Ct. 764, 27 L.Ed.2d 688 (1971); *Perez v. Ledesma,* 401 U.S. 82, 91 S.Ct. 674, 27

L.Ed.2d 701 (1971); and *Boyle v. Landry,* 401 U.S. 77, 91 S.Ct. 758, 27 L.Ed.2d 696 (1971). *Cf., Allee v. Medrano,* 416 U.S. 802, 94 S.Ct. 2191, 40 L.Ed.2d 566 (1974); and *Steffel v. Thompson,* 415 U.S. 452, 94 S.Ct. 1209, 39 L.Ed.2d 505 (1974).

constitutionality of the statute in federal court under 28 U.S.C. § 2241(c)(3).[16] The reason for denying habeas corpus relief in those cases is that the petitioner can assert his constitutional claim as a defense in the state court prosecution and, if convicted, appeal to the United States Supreme Court. *See Younger v. Harris, supra,* 401 U.S. at 45, 91 S.Ct. 746.

■ In a situation like the instant case, however, the Supreme Court has determined that when a petitioner is held by the state "to answer for an act which he was authorized to do by the law of the United States, which it was his duty to do . . and if, in doing that act, he did no more than what was necessary and proper for him to do, he *cannot* be guilty of a crime under the law of the [s]tate . . .." *In re Neagle, supra,* 135 U.S. at 75, 10 S.Ct. at 672. When this is true the prosecution has no factual basis upon which to prosecute and the entire proceeding is a nullity. *Cf. Ex parte Royall,* 117 U.S. 241, 6 S.Ct. 734, 29 L.Ed.2d 868 (1886). In circumstances like these where, under any view of the facts, a federal officer does no more than is necessary and proper in the performance of his duty, the state should not be allowed to review the exercise of federal authority. One of the basic tenets in the application of the Supremacy Clause is that the states have no power to determine the extent of federal authority.[17] To rule otherwise would allow a state to punish the exercise of federal authority under the guise of questioning the right of federal officials to act.

In light of these observations we agree with the statement made in *In re McShane, supra.* This is particularly so where, on the basis of the overall record, viewing the facts and conflicting evidence in the light most favorable to the state, there exists no evidence to support a finding that petitioner was acting outside the scope of his authority or that he employed means which he could not honestly consider reasonable in discharging his duties.

The judgment is affirmed.

BROWNING, Circuit Judge, concurring:

I concur because I believe the BNDD regulations can be reasonably read as authorizing petitioner's conduct as found by the district court.

Although the regulations prohibit an agent from firing "at fleeing suspects," they impliedly authorize firing at a person "to protect [the agent's] own life or that of some other person." It was not unreasonable for the agent to believe the regulations, read together, authorized him to shoot a fleeing suspect who posed a danger to the life of the agent or other person. The two provisions are to be read together, not as independent, absolute commands. An agent would not be required to remain passive if a suspect fired as he fled. The present case is only a slight step removed. The district court found that petitioner reasonably believed the suspect had shot Agent Filben and was armed and dangerous, and that if the suspect reached the cover of the woods the lives of the pursuing officers would be endangered. The court further found that petitioner acted honestly and reasonably in shooting the suspect. The findings are not clearly erroneous. In light of the findings, I conclude the agent acted within the scope of his authority. *See In re Fair,* 100 F. 149, 154–55 (D.Neb.1900).

---

16. 28 U.S.C. § 2241(c)(3) provides:

(c) The writ of habeas corpus shall not extend to a prisoner unless—

. . . . .

(3) He is in custody in violation of the Constitution or laws or treaties of the United States; . . .

17. Compare Chief Justice Marshall's statement, in a somewhat different context:

If the legislature of the several states may, at will, annul the judgments of the courts of the United States, and destroy the rights acquired under those judgments, the constitution itself becomes a solemn mockery; and the nation is deprived of the means of enforcing its laws by the instrumentality of its own tribunals.

*United States v. Peters,* 9 U.S. (5 Cranch) 115, 136, 3 L.Ed. 53 (1809).

MERRILL, Circuit Judge, dissenting:

I respectfully dissent.

The question under *Ex parte Neagle,* 135 U.S. 1, 75, 10 S.Ct. 658, 672, 34 L.Ed. 55 (1890), is whether Clifton was "held in the state court to answer for an act which he was authorized to do by the law of the United States, which it was his duty to do as [agent] of the United States, and if, in doing that act, he did no more than what was necessary and proper for him to do * * *." *Neagle* holds, under the supremacy clause of the Constitution, that if Clifton was so acting pursuant to his authority and duty under federal law, then the state cannot hold such conduct to be criminal. As a matter of law, a crime has not been committed.

Sixteen years after *Neagle,* in *United States ex rel. Drury v. Lewis,* 200 U.S. 1, 26 S.Ct. 229, 50 L.Ed. 343 (1906), the question was before the Court again. There the Court pointed out that federal habeas corpus jurisdiction to free a state prisoner prior to trial should not be freely exercised. It stated:

> "It is an exceedingly delicate jurisdiction given to the Federal courts by which a person under an indictment in a state court, and subject to its laws, may, by the decision of a single judge of the Federal court, upon a writ of *habeas corpus,* be taken out of the custody of the officers of the state, and finally discharged therefrom, and thus a trial by the state courts of an indictment found under the laws of a state be finally prevented."

200 U.S. at 7, 26 S.Ct. at 231.

The nature of the question before the federal habeas corpus judge was discussed:

> "The circuit court was not called on to determine the guilt or innocence of the accused. That was for the state court if it had jurisdiction  * * *."

*Id.* at 8, 26 S.Ct. at 232.[1]

This distinction should, I feel, be kept in mind. It is not for the federal habeas judge to decide whether Clifton acted reasonably in responding as he did to the extraordinary pressures imposed by the situation. That question is for the criminal forum. The question for the habeas judge is whether the manner in which Clifton responded was authorized by the law of the United States; whether it was his duty as agent of the Bureau of Narcotics and Dangerous Drugs to do what he did.

Where the authority to follow certain procedures is not the subject of explicit instructions, the reasonableness of the response to the pressures of the moment may well figure in the determination of authority by the habeas judge. Here, however, the answer to the question of authority is given by the Bureau regulations quoted in footnote 7 of Judge Lay's opinion. Here the Bureau has anticipated the situation in which Clifton found himself and has explicitly forbidden him to act in the manner in which he acted. The language is categorical: "Agents will not fire at fleeing suspects or fleeing defendants." The intent can hardly be more plainly expressed. Other language in the regulations ("Except to protect his own life or that of some other person"; "Agents will not remain passive in a threatening situation") cannot be read by me to refer to anything other than a present threat. They cannot be read to include the hazards presented by some future confrontation without reading all meaning of the explicit language prohibiting firing at fleeing persons. I would suppose that every suspect or defendant who successfully escapes arrest can be expected

---

1. A federal officer need not submit to a state court forum for trial of the criminal action against him, however. 28 *U.S.C.* § 1442(a)(1) provides that a civil action or criminal prosecution commenced against him in a state court may be removed to the district court "embrac-

ing the place wherein it is pending" by "[a]ny officer of the United States * * * for any act under color of such office or on account of any * * * authority claimed under any Act of Congress for the apprehension * * * of criminals * * *."

to pose a threat to officers in the process of capture.

Clifton, it is true, was sent out to place Dickenson under arrest and everything done by Clifton was with the purpose of accomplishing that end. It could, therefore, be said that his conduct was within his "scope of authority" as that phrase is used in Judge Lay's opinion. *Neagle,* however, uses "authority" and "duty" in a much narrower sense. It addresses the question of what specifically was done—the manner in which a concededly proper objective was sought to be achieved. It is to this inquiry that the regulation explicitly is directed.

It may well be that Clifton, under the pressures of the moment, sincerely believed that he was acting properly and in accordance with the regulation. But, again, this is not the question for the habeas judge. If anything, this goes to the question of criminal guilt under state law. That such an inquiry is relevant serves only to establish that conduct in violation of the regulation is not *per se* criminal. It is, nevertheless, expressly proscribed and thus unauthorized.

I would reverse.