STATE OF CONNECTICUT, Plaintiff,

v.

Thomas MARRA, Defendant.

Crim. No. B–81–38.

United States District Court, D. Connecticut.

Dec. 3, 1981.

Donald Brown, Conn. State's Atty., Bridgeport, Conn., for Fairfield County.

Louis Stollman, David Abbamonte, Bridgeport, Conn., for defendant.

Robert Luskin, Paul Coffey, U. S. Dept. of Justice, Washington, D. C., for the U. S.

## RULING ON DEFENDANT'S MOTION TO DISMISS

DALY, District Judge.

■ This case, in which the State of Connecticut is prosecuting defendant for attempted bribery of a public official in violation of Conn.Gen.Stats. § 53a–147(a), was removed from State Superior Court to this Court pursuant to 28 U.S.C. §§ 1442(a)(1) and 1446(c). Defendant has moved for dismissal, claiming the alleged crime for which he is being prosecuted was committed while he was acting under the direction and control of duly authorized federal officers, and, therefore, he is immune under the Supremacy Clause of the federal constitution from state criminal prosecution. An evidentiary hearing was held at which the following facts were disclosed.

In June of this year, defendant Marra was sentenced to two years imprisonment by a Federal Court in New Hampshire for transporting stolen cars in interstate commerce. Apparently in hopes that the court in New Hampshire would be favorably disposed toward his anticipated motion for reduction of sentence, and aware of an ongoing federal investigation into possible official corruption within the Bridgeport Police Department, defendant, shortly after his sentencing in New Hampshire, contacted agents of the Federal Bureau of Investigation (FBI) with information that he believed would be useful to them in conjunction with that investigation. Marra told special agents Brendan Fisk and Stephen Wiley that some Bridgeport City officials or employees had received payoffs in return for the recent transfer of the City's towing contract, which had previously been held for many years by the defendant's family. The FBI had already received a similar allegation, specifically implicating the Superintendent of Police, Joseph Walsh, from another, independent source.

A few weeks later, defendant encountered Arthur ("Tillie") Russo and Superintendent Walsh, both of whom defendant knew personally, in the Hu Ke Lau, a Bridgeport restaurant of which Mr. Russo was the permittee and which, only a few weeks earlier, had been the subject of an FBI raid. An angry conversation ensued between defendant and Walsh over the transfer of the towing contract. Defendant told Walsh it was rumored that the contract had been transferred as a result of payoffs to city employees. Walsh suggested that defendant get back in touch with Mr. Russo the following week to see if the three of them could meet again and perhaps the problem could be "squared away".

Around the end of July or early August, defendant met with FBI Agents Fisk and Wiley and related his conversation with Superintendent Walsh to them. Agent Fisk then asked defendant if he would be willing to cooperate with the FBI by arranging and attending a meeting with Russo equipped with a hidden tape recorder. Defendant agreed to do so.

At the direction of Agent Fisk, defendant arranged to meet with Russo on the evening of August 12th. Just before the scheduled meeting was to take place, defendant was outfitted with a hidden tape recorder by FBI agents. At the meeting, defendant, acting again at Agent Fisk's direction, told Russo that he was willing to pay $30,000 to Superintendent Walsh to get the towing contract restored to his family. Russo agreed to "feel out" the Superintendent about the proposed payoff and to try to arrange a meeting between defendant and Walsh.

On August 17th, responding to a call from Russo, and again equipped with an FBI tape recorder, defendant met once again with Russo in the Hu Ke Lau. Russo told defendant that Superintendent Walsh

was interested in defendant's offer of $30,-000. Russo then telephoned Walsh, conversed with him and handed the phone to defendant, who agreed to meet Walsh the following evening on the corner of Chapel and Main Streets in Bridgeport.

The next day, August 18th, FBI agents and Justice Department Strike Force attorneys met to determine what an appropriate course of action would be. It was agreed that defendant would meet with Walsh and present him with an opportunity to accept a $5000 down payment for the return of the towing contract to Marra's family. Authorization for defendant to participate in the plan was sought and obtained from FBI headquarters in Washington, D.C., as well as from the Chief of the Justice Department's Organized Crime and Racketeering Section, the U. S. Attorney for Connecticut, and the chief of the Boston Area Strike Force.

Defendant met with FBI Agents Fisk, Wylie and Hutton and Strike Force Attorney Richard Gregorie, who instructed him in detail as to what he should do and not do, and say and not say during his meeting with Walsh. He was specifically instructed not to enter the Superintendent's car and not to offer any money unless Walsh initiated the subject or asked for it. Defendant was also assured by the federal agents that he would not be violating any state or federal law because he would be acting within FBI Guidelines.[1] Defendant was then supplied by FBI agents with $5000 in cash and a concealed tape recorder as well as a transmitter, which would enable the federal agents to monitor the meeting and to step in and arrest Superintendent Walsh should he violate any federal law during the meeting.

Defendant testified that he did not expect to regain the towing contract for his

uncle and that he believed that he was acting under the authority of the United States government at all times during his meetings with Russo and Walsh.

Before addressing the legal issues involved in the present motion to dismiss, it is important to stress what is *not* involved here. This Court is not called upon in this case to decide the propriety or impropriety of a law enforcement agency's engaging in covert activities or use of informants, "cooperating individuals", or any other type of undercover agents in its investigations. Nor is it necessary for the Court to determine whether "probable cause" or "reasonable indication", or mere hunch is required or sufficient before federal agents may initiate and pursue an undercover "sting" operation like the present one. The only issue currently before this Court is whether this defendant is immune from State prosecution for attempted bribery, and therefore, whether the charges against him should be dismissed.

## I. Federal Immunity From State Criminal Prosecution

■ Since the landmark decision of *In re Neagle*, 135 U.S. 1, 10 S.Ct. 658, 34 L.Ed. 55 (1890), the law has been very clear that, under the Supremacy Clause, a federal officer cannot be held on a state criminal charge where the alleged crime arose during the performance of his federal duties and was necessary and proper to the performance of those duties. In *Neagle*, the Supreme Court affirmed the lower court's discharge, on a writ of habeas corpus, of a United States Marshal, who shot and killed a man named Terry, mistakenly believing that Terry was about to draw a knife against a Justice of the Supreme Court whom Neagle was assigned to protect. The Court held:

1. The Attorney General's Guidelines on the Use of Informants and Confidential Sources specifically empower federal law enforcement officials to authorize a private individual to engage in what would "otherwise be criminal activity," if the appropriate supervisory FBI official determines that the "conduct is necessary to obtain information or evidence for paramount

prosecutive purposes." These Guidelines were promulgated pursuant to 28 U.S.C. §§ 509, 510, and 533, which provide statutory authority for the Attorney General of the United States to exercise all functions of the Justice Department, to delegate his authority, and to detect and prosecute crimes against the United States, respectively.

"[I]f the prisoner is held in the state court to answer for an act which he was authorized to do by the law of the United States, which it was his duty to do as a marshal of the United States, and, if in doing that act, he did no more than what was necessary and proper for him to do, he *cannot* be guilty of a crime under the law of the State of California.

135 U.S. at 75, 10 S.Ct. at 672. (Emphasis in original.)

■ The law as enunciated in *Neagle*, and most recently applied by the Ninth Circuit in *Clifton v. Cox*, 549 F.2d 722 (9th Cir. 1977),[2] has remained undisturbed. The principle underlying *Neagle* and its progeny are that the federal government, as an independent and supreme sovereign, must be permitted to "perform its functions without conforming to the police regulations of a State," *Arizona v. California*, 283 U.S. 423, 51 S.Ct. 522, 75 L.Ed. 1154 (1931); *Johnson v. Maryland*, 254 U.S. 51, 41 S.Ct. 16, 65 L.Ed. 126 (1920). *See also, McCulloch v. Maryland*, 4 Wheat. 316, 4 L.Ed. 579 (1819).

■ Moreover, federal immunity from state prosecution is not limited to a particular class of federal officers or to paid employees of the federal government. Rather, it extends to any person, including a private citizen like defendant, who acts under the direction and control of federal authorities or pursuant to federal law or court order. For example, immunity has been extended to a railroad clerk selling tickets pursuant to a federal court order which contradicted state law, *Hunter v. Wood*, 209 U.S. 205, 28 S.Ct. 472, 52 L.Ed. 747 (1908); to members of a posse comitatus called upon to assist a federal marshal in performing his duties, *West Virginia v. Laing*, 133 F. 887 (4th Cir. 1904); and to the foreman of a private construction gang building a telegraph line, which had been authorized by federal law, *Ex Parte Conway*, 48 F. 77 (C.C.D.S.C.1891).

■ It goes without saying, of course, that federal immunity is not absolute and does not extend to all actions of federal agents, or even to all of their actions taken during the course of their official duties. *See Johnson v. Maryland, supra*, 254 U.S. at 56, 41 S.Ct. at 16; *United States ex rel. Drury v. Lewis*, 200 U.S. 1, 8, 26 S.Ct. 229, 231, 50 L.Ed. 343 (1906); *Castle v. Lewis*, 254 F. 917, 926 (8th Cir. 1918). *Neagle* and the cases which have followed it have established that federal protective immunity will shield a federal agent from state prosecution only where his acts are both authorized by the laws of the United States and necessary and proper to the execution of his responsibilities. *In re Neagle, supra*, 135 U.S. at 75, 10 S.Ct. at 672; *Clifton v. Cox, supra*, 549 F.2d at 725–29; *Ex Parte Warner*, 21 F.2d 542 (N.D.Okl.1927).

The Court turns now to the application of these standards to the facts of this case.

### A. Scope of Authority

■ In finding the requisite authority under "the laws of the United States", a federal officer or agent need not show that his actions were authorized or required by a particular act of Congress. As the Supreme Court stated in *Neagle, supra*,

"In the view we take of the constitution of the United States, any obligation fairly and properly inferable from that instrument or any duty of the officer to be derived from the general scope of his duties under the laws of the United States, is a 'law,' within the meaning of this phrase."

*Id.*, 135 U.S. at 59, 10 S.Ct. at 666. Authority for federal officers to take specific actions has been found in general statutes authorizing an agency to function, *see, e.g. Johnson v. Maryland, supra*, 254 U.S. at 57, 41 S.Ct. at 16–17; in regulations promulgated by a federal agency, *see, e.g., Boske v. Comingore*, 177 U.S. 459, 467, 20 S.Ct. 701, 704, 44 L.Ed. 846 (1900); and even by inference from Congressional appropria-

---

**2.** In that case, a federal narcotics agent, who shot and killed an escaping suspect, mistakenly believing that the suspect had shot the agent's partner, was held immune from state prosecution for murder, even though he acted contrary to federal regulations on an agent's use of firearms.

tions, see, e.g. Ohio v. Thomas, 173 U.S. 276, 282–84, 19 S.Ct. 453, 455–56, 43 L.Ed. 699 (1899). And, when it is a private citizen's actions that are at issue, authority for those actions may stem from the authorization or order of an official representative of the federal government, see, e.g., Hunter v. Wood, 209 U.S. 205, 28 S.Ct. 472, 52 L.Ed. 747 (1908); West Virginia v. Laing, 133 F. 887 (4th Cir. 1904); Ex Parte Conway, 48 F. 77 (C.C.D.S.C.1891).

■ The evidence adduced at the removal hearing and the hearing on the present motion shows beyond doubt that defendant's offer of a bribe to Superintendent Walsh, the specific act for which the State seeks to prosecute him, was undertaken at the behest, direction and control of persons whom defendant knew to be agents of the FBI and Justice Department Strike Force attorneys. These federal officials were themselves authorized to recruit defendant and to instruct him as they did on the actions he was to take.[3] However, even if the authority of the FBI agents and the Strike Force Attorneys had been defective, defendant would still have possessed the requisite authorization, for immunity purposes, by virtue of the apparent authority of the federal officials under whose direction and control he acted. See In re Fair, 100 F. 149 (D.Neb.1900), in which two U.S. soldiers, who acted under orders that were probably unlawful, were held to be immune from state prosecution for the killing of an escaping prisoner; and In re Lewis, 83 F. 159 (D.Wash.1897) which held that treasury department employees could not be subjected to criminal punishment by a state because of actions taken pursuant to an "improvidently issued" warrant.

It is true that defendant exceeded his specific authority by initiating the offer of money to Superintendent Walsh. However, such an error, resulting from confusion or nervousness or bad judgment, would not strip him of his federal authority, see, e.g., Clifton v. Cox, 549 F.2d 722 (9th Cir. 1977) and In re Lewis, supra, 83 F. at 160. Defendant in this case at all times believed he was acting pursuant to federal law and federal authority. His testimony, that he did not expect to regain the City's towing contract for his family by offering the $5000 to Superintendent Walsh, the Court finds credible in view of the factors that motivated defendant to cooperate with the FBI and the other circumstances surrounding his offer of the bribe. Lacking a criminal intent, defendant retains his federal authority for immunity purposes, despite the mistakes he made in carrying out the FBI's instructions. As Judge Munger stated in In re Fair, supra, 100 F. at 155:

"If petitioners acted wantonly with a criminal intent, then they were not acting within the scope of the authority conferred by the laws of the United States. On the other hand, if they acted without any criminal intent, but in an honest belief that they were discharging the duties of a soldier, then their offense, if offense it was, was not against the laws of the state and in such case, the state has no jurisdiction."[4]

The Court concludes that, even though defendant may have technically exceeded his express authority, he continued to act under the authority of the United States government. Furthermore the State has

3. In addition to the specific approval for the August 18th plan, which was sought and obtained from FBI Headquarters and appropriate supervisory personnel in the Department of Justice, the local federal officials who directed defendant's actions were also authorized by the Attorney General's Guidelines on the Use of Informants and Confidential Sources, see fn. 1.

4. See also, In re Lewis, 83 F. 159, at 160 (D.Wash.1897) where the court observed:
"But where an officer, from excess of zeal or misinformation, or lack of good judgment in

the performance of what he conceives to be his duties as an officer, in fact transcends his authority, and invades the rights of individuals, he is answerable to the government or power under whose appointment he is acting, and may also lay himself liable to answer to a private individual who is injured or oppressed by his action; yet, where there is no criminal intent on his part, he does not become liable to answer to the criminal process of a different government."

failed to present any evidence or conceivable factual basis for a contrary conclusion.[5]

### B. The Necessary and Proper Standard.

■ To establish that his conduct was "necessary and proper," *In re Neagle, supra*, 135 U.S. at 75, 10 S.Ct. at 672, defendant need not show that his actions were in fact necessary or in retrospect justifiable, but only that he reasonably thought them to be so. *See, Clifton v. Cox, supra*, 549 F.2d at 728; *In re Fair, supra*, 100 F. at 149; *In re McShane*, 235 F.Supp. 262, 274 (N.D.Miss.1964); *Brown v. Cain*, 56 F.Supp. 56, 58 (E.D.Pa.1944).

■ The State's Attorney may be correct that, objectively, it is not necessary or proper conduct for undercover federal agents to themselves initiate bribe offers, *United States v. Jannotti*, 501 F.Supp. 1182 (E.D. Pa.1980).[6] However, defendant clearly believed that his actions were justified, based on the representations and assurances he had received from the federal officials under whose direction he was acting. The fact that the defendant, who is neither a professional undercover agent nor a lawyer well-versed in the subtleties of the law, inadvertently initiated the offer of a bribe does not negate his belief at the time that his actions were necessary and proper to the fulfillment of his assigned duties.

Again, it must be stressed that the Court need not determine if the federal officers who directed defendant's actions were justified in initiating the investigation of Superintendent Walsh or whether they believed the "sting" operation involving defendant was necessary and proper. Such questions are totally immaterial to the issue before this Court.

The Court finds that defendant's actions were authorized by official representatives of the federal government and that he honestly believed that all of his actions were necessary and proper to the fulfillment of his assigned mission. That being the case, the Court holds that defendant is entitled to federal protective immunity from state criminal prosecution and the charges against him are therefore ordered dismissed.

It is SO ORDERED.

---

5. *Cf., United States ex rel. Drury v. Lewis*, 200 U.S. 1, 26 S.Ct. 229, 50 L.Ed. 343 (1906), in which the Supreme Court upheld the lower court's denial of a writ of habeas corpus because there was a conflict of evidence as to whether the petitioner was acting in performance of a duty imposed by Federal law.

6. This case, as well as the others cited by the State's Attorney—*United States v. Twigg*, 588 F.2d 373 (3d Cir. 1978); *United States v. Arch-* er, 486 F.2d 670 (2d Cir. 1973)—are cases which raised the issue of whether a federal agent's actions were necessary and proper, not in the context of a claim of immunity by the federal operative, but as a defense by the individual who was the *subject* of the federal investigation. These cases, then, have no bearing on the determination of the issue of federal immunity.