State of IDAHO, Plaintiff–Appellant,

v.

Lon T. HORIUCHI, Defendant–Appellee.

No. 98–30149.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted June 9, 1999

Filed June 14, 2000

Denise Woodbury, Prosecuting Attorney, Boundary County, Idaho, Stephen Yagman, Special Prosecutor, Joseph Reichmann and Marion R. Yagman, Special Deputy Prosecutors, Yagman & Yagman & Reichmann, Venice Beach, California, Ramsey Clark, Special Deputy Prosecutor (argued), New York, New York, for the plaintiff-appellant.

Earl J. Silbert, Adam S. Hoffinger, Robert A. Salerno, Piper & Marbury, Washington, D.C., for the defendant-appellee.

Before: KOZINSKI and FERNANDEZ, Circuit Judges, and SHUBB,* District Judge.

Opinion by Judge SHUBB; Dissent by Judge KOZINSKI.

SHUBB, District Judge:

The State of Idaho appeals from the judgment of the district court dismissing the criminal case against FBI Special Agent Lon Horiuchi. *See* Fed.R.Crim.P. 12(b). The criminal complaint, charging Horiuchi with the crime of involuntary manslaughter, was initially filed in Idaho state court. Specifically, the complaint alleged that Horiuchi:

> did unlawfully, but without malice, kill Vicki J. Weaver, a human being, in the operation of a firearm in a reckless, careless or negligent manner, to wit: discharging the firearm through the front door of the Weaver residence in an attempt to shoot Kevin Harris as he entered the door from outside, without first determining whether any person other than his intended target was present on the other side of the door, a violation of I.C. 18–4006(2), a felony.

Horiuchi removed the prosecution to federal court pursuant to 28 U.S.C. § 1442(a)(1). The district court dismissed the charge on the ground that the Supremacy Clause [1] protected Horiuchi from prosecution because the criminal case sought to punish Horiuchi for actions taken in pursuit of his duties as a federal law enforcement officer. We affirm.

## FACTUAL BACKGROUND

On August 21, 1992, there was an outstanding warrant for Randall Weaver, Vicki Weaver's husband, based on weapons trafficking charges. On August 21, 1992,

---

* The Honorable William B. Shubb, Chief Judge of the United States District Court for the Eastern District of California, sitting by designation.

1. The Supremacy Clause provides: "This Constitution, and the Laws of the United States which shall be made in Pursuance thereof; and all Treaties made, or which shall be made, under the Authority of the United States, shall be the supreme Law of the Land; and the Judges in every State shall be bound thereby, any Thing in the Constitution or Laws of any State to the Contrary notwithstanding." U.S. Const. Art. VI, Clause 2.

several federal agents (Horiuchi not among them) went to serve the warrant at the Weaver Ranch at Caribou Ridge (a.k.a. "Ruby Ridge"). The agents encountered Randall Weaver, his teenage son Sammy, and friend Kevin Harris on the road leading to the ranch. A gun battle erupted during the encounter. Deputy Marshal Degan was shot and killed, as was Sammy Weaver.[2] The federal agents did not know that Sammy was killed. Randall Weaver and Kevin Harris retreated to the ranch with Sammy's body and placed it in the birthing shed, a structure on the Weaver property.[3]

That same day, the F.B.I. dispatched a response force to the area, including the Hostage Rescue Team to which Horiuchi belonged as a sniper. Horiuchi was a highly trained marksman qualified to hit a quarter of an inch target at 220 yards. He was also trained to hit a moving target. Upon arrival, Horiuchi was briefed. According to Horiuchi's trial testimony, the briefings included, among other things, that Deputy U.S. Marshal Degan had been shot and killed during a fire fight near the Weaver residence; that during the fire fight, the Marshals were pinned by indiscriminate fire; that either Harris, Randall Weaver or Vicki Weaver was involved in the shooting of Deputy Degan; that Randall Weaver had been in the military attached to a special forces unit; that the individuals in the cabin had a habit of coming out of the cabin armed;[4] that whenever the dogs barked, Randall Weaver sent one of the Weaver children to a rock outcropping to look for the source of the disturbance and to report back to him; that Randall Weaver may have called in or had assistance from other individuals either living in the area or from outside the area moving into the location; that the

Marshals had been attempting to effect an arrest of Randall Weaver for a firearms violation; and that the decision had been made that any team members going up the hill toward the cabin were in danger.

Finally, Horiuchi was briefed on the final rules of engagement that the FBI had developed for the Ruby Ridge crisis. The ordinary Rules of Engagement provide that an FBI agent may use deadly force only in self defense or with reason to believe that they or another are in danger of grievous bodily harm. The FBI modified these rules for the Ruby Ridge crisis. Originally, the team was told to shoot any armed adult if the shot could be taken without risk of harm to a child. Later that day, the rules were modified and restricted to advise that deadly force could be used against any armed adult male if the shot could be taken without a child being injured.

The following day, Horiuchi, armed with a high-powered .308 caliber rifle with a ten power telescopic scope, took a position approximately two to three hundred yards from the Weaver ranch. From his position, Horiuchi had a direct view of the cabin's side. He could also see the front porch and back deck of the cabin. He could not see the front door when it was closed. If the front door opened, he could see it, but could not see inside the cabin.

At Weaver's trial, Horiuchi testified that at around 5:45 or 5:50 p.m., a young woman came out of the cabin and moved toward the rock outcropping. She remained outside for a few minutes before returning inside. Horiuchi did not fire at the young female because she was not armed and he assumed she was a child. Right after the female went back inside the front door, a male exited the back door of the cabin to

---

**2.** Kevin Harris and Randall Weaver stood trial in federal court for an assault with a deadly weapon and for the first degree murder of Degan.

**3.** The district court did not hold an evidentiary hearing. Rather, the court reviewed the transcript from the preliminary hearing and

Horiuchi's trial testimony in *United States v. Randall C. Weaver and Kevin L. Harris.*

**4.** This briefing was supported by Sara Weaver's testimony at the preliminary hearing that her family always carried guns.

the back deck and appeared to be checking some ponchos or blankets before returning inside. Horiuchi did not fire at the male because he did not appear to be armed.

Horiuchi further testified that, a few minutes later, he heard a helicopter crank up on the valley floor, lift off, and then he saw it disappear behind the trees. Horiuchi heard the helicopter flying either behind him or to his right or left, but he could not see it. The federal agents used helicopters to get an overview of the land.

Within ten seconds after the helicopter lifted off, two males and a young female (later identified as Harris, Randall Weaver, and Weaver's teenage daughter Sara,) exited the cabin and ran toward the rock outcropping. This outcropping had been described to Horiuchi during his briefing as a lookout position. The three were dressed similarly, in dark clothing. The last individual out the door, a male, had a long gun held in a "high port" carry, meaning up high and near his chest. The three disappeared from Horiuchi's view for about three to five seconds. They reappeared again past the rock outcropping for another three to five seconds and then disappeared again.

Horiuchi told his partner to stay on the front door of the residence while he looked through the trees to see where the three individuals had disappeared. Horiuchi thought they were moving to defensive positions located along the rock outcropping. Next, he saw the man carrying the long gun come around the corner of the birthing shed. The man picked up a stick, prodded the ground, and looked in the air in the area above and to the right of Horiuchi. Horiuchi heard the helicopter in the area where the man was looking, and thought the man was looking at the helicopter. The man moved out of Horiuchi's sight for a few more seconds. His partner remained on the front door.

When the man reappeared, he carried the weapon in the high port position and scanned the area above and behind Horiuchi's location. Horiuchi assumed the man was looking at the helicopter. The man continued to move along the side of the building with the gun in a high port carry "like he was getting ready to use it." Horiuchi believed the man would try to take a shot at the individuals in the helicopter so he fired at the armed man. At the time, Horiuchi believed that he had missed, but he in fact had lightly wounded the man. The man turned the corner behind the birthing shed.

Within ten to twenty seconds of Horiuchi's first shot, the three ran back to the cabin. A man carried the rifle and followed about ten yards behind the other man and the teenage girl, who ran together.[5] Horiuchi assumed that the man with the rifle was the same man who he believed was attempting to shoot at the helicopter and who he had shot at earlier. In fact, the first man Horiuchi shot at was Randall Weaver and the man now carrying the rifle was Kevin Harris. Horiuchi assumed that this man was moving back to the house to get in a more protected location, and decided to shoot him. He knew that once the man reached the house, the man could shoot at Horiuchi, his fellow agents, or the helicopter, but the agents could not shoot back because of the children. Horiuchi was trying to prevent the man from getting back into the house.

Horiuchi testified that Harris ran at a high rate of speed toward the cabin, slowed down, paused, and then continued through the door. Specifically, Horiuchi testified that, "He [Harris] had his weapon in his right hand and he was reaching out with his left hand. It appeared to me like he was trying to hold the door open or moving somebody out of the way, and that's the time I shot." Harris flinched

5. Horiuchi originally testified that the male with the weapon was nine paces, which he defined as ten feet, behind the girl and the other man. He later corrected his explanation to say that by nine paces he meant about nine to ten yards.

and disappeared in the house. It was approximately 6:00 p.m.

Horiuchi had "led" Harris to account for the distance that Harris would move while the bullet traveled the intervening two hundred yards. Consequently, the cross hairs of the rifle were on the open door a few inches ahead of Harris. Unfortunately, unbeknown to Horiuchi, Vicki Weaver was on the far side of the door, holding it open, out of Horiuchi's view. The bullet struck her in the head, killing her. It then struck Harris in the shoulder.

At the Weaver trial, Horiuchi testified that he could not see through the door, did not know if someone was behind the door, had not seen Vicki Weaver, and only intended to hit Harris. He did not consider his shot a shot into the house.

The front door to the cabin opens out. The bullet went through the lower right-hand pane of glass on the top half of the cabin's front door. The top half of the door was glass with six divided panes. There were denim curtains that could be pulled over the window. It is disputed whether the curtains over the glass portion of the door were open or closed at the time of Horiuchi's shot. Sara Weaver testified at the preliminary hearing that her family never closed the curtains. However, it was determined at Randall Weaver's trial that the bullet hole in the curtain lines up with the bullet hole in the glass only if the curtain is pulled across the glass.

The witnesses testify differently as to where Vicki Weaver was standing right before and when Horiuchi fired the fatal shot. Horiuchi says he did not see her. Randall Weaver testified at the preliminary hearing that Vicki Weaver had been standing three or four feet beyond the porch holding the baby just after he was shot at the birthing shed, but that he had not seen her until he had been shot. However, when questioned regarding Vicki Weaver's location when she was shot, Randall Weaver testified that, "She came out of the house with the baby—she might have been on the porch. I don't know to be honest with you. I know that she had the baby when she hollered at me and she was holding the baby when we went through the door."

Sara Weaver testified at the preliminary hearing that her mother was holding the door open as Sara, Randall Weaver, and Harris were running for the door. During direct examination, Sara testified that after the first shot her mother stepped out of the door and yelled "what happened?" Sara further stated that, as she stumbled into the house, her mother was standing right in front of the doorway. However, in cross-examination, she clarified her earlier testimony and stated that she does not remember if Vicki Weaver was outside the threshold of the door. Neither Randall nor Sara Weaver saw the bullet hit Vicki Weaver.

After a review of the record, the district court concluded:

> The record supports Mr. Horiuchi's subjective belief that the threat to his or other lives honestly existed; that he intended only to shoot the third individual (Mr. Harris); and that the State has provided no evidence of malice or criminal intent. The record also supports a finding that the means by which Mr. Horiuchi carried out his duties were objectively reasonable based on the circumstances ... and that he did not see Mrs. Weaver behind the door or in the doorway when he fired at Mr. Harris.

Based on these conclusions, the district court held that Horiuchi was entitled to immunity from criminal prosecution under the Supremacy Clause of the Constitution of the United States, and dismissed the indictment pursuant to Federal Rule of Criminal Procedure 12(b)(1). *See* Fed. R.Crim.P. 12(b)(1).

## DISCUSSION

■ Because the district court neither held an evidentiary hearing nor purported to resolve any disputed issues of fact, and the critical facts necessary to resolve the legal issues are not in dispute, our stan-

dard of review is de novo. *See United States v. Head,* 783 F.2d 1422, 1423 (9th Cir.1986).

In the leading case of *Cunningham v. Neagle,* 135 U.S. 1, 10 S.Ct. 658, 34 L.Ed. 55 (1890) (also known as *In re Neagle* ), the Supreme Court considered a petition for writ of habeas corpus filed by Deputy United States Marshal Neagle. Sarah and David Terry had publicly threatened the life of Justice Field, who had presided over a case involving them in his capacity as Circuit Justice for the Ninth Circuit. Consequently, Neagle had been assigned to protect Justice Field during his travels in California, the Terrys' home state. While briefly stopped in Fresno en route from Los Angeles to San Francisco, the Terrys boarded the train carrying Justice Field. David Terry attempted to provoke a fight with Justice Field, and when Terry appeared to reach for a knife, Deputy Neagle shot him to death. The State of California brought criminal charges against Neagle.

The Supreme Court granted the petition for writ of habeas corpus. In considering the "supremacy of the government of the United States," the Court held:

> [I]f the prisoner is held in the state court to answer for an act which he was authorized to do by the law of the United States, which it was his duty to do as marshal of the United States, and if, in doing that act, he did no more than what was necessary and proper for him to do, he cannot be guilty of a crime under the law of the state of California.

*Neagle,* 135 U.S. at 62, 75, 10 S.Ct. 658.

■ Subsequent cases have developed this holding into a doctrine of immunity.

*See Kentucky v. Long,* 837 F.2d 727 (6th Cir.1988); *Morgan v. California,* 743 F.2d 728 (9th Cir.1984); *Baucom v. Martin,* 677 F.2d 1346 (11th Cir.1982); *Clifton v. Cox,* 549 F.2d 722 (9th Cir.1977); *see also Connecticut v. Marra,* 528 F.Supp. 381 (D.Conn.1981); *In re McShane,* 235 F.Supp. 262 (N.D.Miss.1964); *In re Lewis,* 83 F. 159 (D.Wash.1897). To be entitled to immunity under this doctrine, the defendant must show two elements: first, the act must have been within the scope of official authority; second, the defendant must have honestly and reasonably believed the act to have been necessary and proper under the circumstances. *See Clifton,* 549 F.2d at 726, 728. The second element of the test thus has both objective and subjective elements. *See id.* at 728.[6]

### A. *Immunity is Properly Decided on a 12(b) Motion*

Horiuchi brought this motion to dismiss based on Supremacy Clause immunity under Federal Rule of Criminal Procedure 12(b). We must first decide if immunity is properly decided on such a motion. Rule 12(b) provides for pretrial motions to dismiss raising "[d]efenses and objections based on defects in the indictment or information...." Fed.R.Crim.P. 12(b)(1). The Advisory Committee Notes to this provision, adopted in 1944, state that such "objections and defenses" include "all defenses and objections which are capable of determination without a trial of the general issue ... [including] ... former jeopardy, former conviction, former acquittal,

---

**6.** Supremacy clause immunity is a defense; the defendant must show the two elements. The district court properly cites *Clifton,* which states that the necessary and proper standard does not require the defendant to "show that his action was in fact necessary or in retrospect justifiable, only that he reasonably thought it to be." *Clifton* 549 F.2d at 728. At one point, however, the District Judge's decision seems to have confused who has the burden of establishing objective reasonableness. The district court stated, "the State has not carried its burden of presenting an affir-

mative showing that Mr. Horiuchi acted in bad faith or that Mr. Horiuchi acted in a way that cannot be considered reasonable...." Despite this apparent confusion, the district court opinion turns on Horiuchi's testimony and evidence from the preliminary hearing, not on the State's lack of evidence. The district court applied the correct burden of proof when it found that Horiuchi honestly and reasonably believed shooting Harris to have been necessary and proper under the circumstances.

statute of limitations, immunity, lack of jurisdiction, failure of indictment or information to state an offense, etc." Fed. R.Crim.P. 12(b)(1) and (2) Advisory Committee Notes.

■ When possible, Supremacy Clause immunity is an issue that should be determined before trial in order to avoid making the federal officer go through an entire state criminal procedure if he is immune. *See Long,* 837 F.2d at 752. We thus agree with the Sixth Circuit's holding in *Long* that "as a general proposition ... a Rule 12(b) motion is a proper vehicle by which to assert the defense of immunity under the Supremacy Clause of the United States Constitution." *Id.* at 750.

## B. *Scope of Authority*

The district court found that the State has conceded that Horiuchi was acting within the scope of his duties at the time of the shooting of Vicki Weaver. The State does not dispute this issue on appeal.

## C. *Necessary and Proper*

■ We therefore turn to the question of whether Horiuchi's actions were "necessary and proper" under the circumstances. This determination requires an inquiry into whether Horiuchi honestly (subjective standard) and reasonably (objective standard) believed his actions to be necessary and proper. *See Clifton,* 549 F.2d at 728–29. Horiuchi does not have to "show that his action was in fact necessary or in retrospect justifiable, only that he reasonably thought it to be." *Id.* at 728.

The district court found that Horiuchi honestly and reasonably believed that the intentional shooting of Mr. Harris was necessary and proper based upon existing circumstances at Ruby Ridge on August 22, 1992. The record supports this finding.

First, there is nothing in the record to dispute the district court's finding that Horiuchi's subjective belief that his actions were necessary and proper was honestly held. The State has presented no evidence of evil or malicious intent, nor has the State shown any facts to dispute Horiuchi's state of mind. In fact, the state only charged Horiuchi with manslaughter, a crime that is specifically charged as being "without malice."

Second, the record supports the district court's finding that Horiuchi's belief was objectively reasonable. The entire period of time between when Horiuchi took the first shot at Randall Weaver and the second shot at Harris lasted only a few seconds. During these few seconds, he saw two men come out of the cabin who he assumed correctly were Randall Weaver and Kevin Harris. Horiuchi had been briefed that either Harris or Weaver had killed a federal agent just the day before. He knew at least one of them was armed, as he saw one carrying a rifle. He had been briefed that the residents of the cabin always were armed. While carrying the rifle in a "high port" position, "like he was getting ready to use it," the armed man scanned the sky looking toward the area where the helicopter filled with federal agents hovered. Horiuchi took his first shot at the armed man, so the men were aware that he was nearby. All three disappeared from view for a few seconds, and then Horiuchi saw all three individuals running back to the cabin. One of the men (Harris), hung back slightly from the other two, carrying a rifle. Horiuchi fired his second shot.

We have previously addressed the question of when a law enforcement officer may use deadly force against an escaping felon. In *Forrett v. Richardson,* 112 F.3d 416 (9th Cir.1997), we interpreted the Supreme Court's holding in *Tennessee v. Garner,* 471 U.S. 1, 105 S.Ct. 1694, 85 L.Ed.2d 1 (1985), regarding the constitutional use of deadly force. *Garner* held:

[w]here the officer has probable cause to believe that the suspect poses a threat of serious physical harm, either to the officer or to others, it is not constitutionally unreasonable to prevent escape by using deadly force. Thus, if the suspect

threatens the officer with a weapon or there is probable cause to believe that he has committed a crime involving physical harm, deadly force may be used if necessary to prevent escape, and if, where feasible, some warning has been given.

*Garner*, 471 U.S. at 11, 105 S.Ct. 1694. In *Forrett*, we held that, under *Garner*, it was reasonable for officers to shoot Forrett, a suspect in a vicious assault during a home invasion robbery, to prevent his escape. Forrett had eluded officers for over an hour, vaulting fences and removing clothing. He was fleeing into a residential area where he could easily have taken hostages. We held that even if his capture were inevitable, deadly force was still reasonable because there was a substantial risk that Forrett would cause death or serious bodily harm if his apprehension were delayed. *See Forrett*, 112 F.3d at 420–421.

Like Forrett, Harris presented a greater danger to the officers and to others if he got back inside the cabin, in part because the cabin provided cover from the marshals. Once inside, Harris could take up a defensive position where he could shoot out, but the officers could not shoot in without the danger of harming a child. Further, Harris could rearm himself and regroup with the others in the cabin. Horiuchi had been briefed that Randall Weaver may have called on or had assistance from other individuals in the area. He knew that all of the Weavers were armed; in fact, the initial gun battle where Marshal Degan was killed occurred because the Marshals were trying to arrest Randall Weaver for a firearms violation. Finally, Horiuchi knew that either Randall Weaver or Harris had shot and killed a marshal and that the armed man had just threatened a helicopter filled with federal agents; clearly the armed man was dangerous.

Horiuchi knew it would be difficult, if not impossible, to apprehend the man once he re-entered the cabin, due to the presence of the Weaver children. Had he hesitated for even a few seconds or called out a warning (even assuming that Harris could have heard him from 200–300 yards away), Harris could have fled into the cabin, taking up a defensive, armed position.

■ Courts must avoid the temptation to dissect the events which flashed before a police officer in a matter of seconds and to over scrutinize the officer's response to those events. It is all too easy for judges pondering a cold record in the sanctity of their chambers to second guess the split-second decisions of the officer on the scene. As Judge Trott recently observed: "In cold print, the events ... appear one way, but as they were unfolding ..., they surely had a different cast and immediacy." *LaLonde v. County of Riverside*, 204 F.3d 947, 962 (9th Cir.2000) (Trott, concurring in part and dissenting in part).

Faced with a dangerous armed man who was running to an area where he would present a greater danger, Horiuchi had less than a few seconds to make a decision. In the words of Justice Holmes, "[d]etached reflection cannot be demanded in the presence of an uplifted knife." *Brown v. United States*, 256 U.S. 335, 343, 41 S.Ct. 501, 65 L.Ed. 961 (1921). Harris was a suspect in the shooting of a federal marshal; he was threatening a helicopter; he was running to a place where he could rearm, regroup, and take up a defensive position. Horiuchi did not see Vicki Weaver standing behind the open door with the curtains closed. He had no reason to believe that a woman holding a baby would be standing outside the threshold of the cabin, but hidden by the open door, after her husband had been shot at by an unknown agent. Horiuchi saw no danger to others, and he shot. He only intended to hit Harris.

The district court's finding that Horiuchi reasonably believed that shooting Harris was necessary and proper under the circumstances is supported by the evidence. Today, all must regret the tragic result. However, given the circumstances at the

time, Horiuchi made an objectively reasonable decision.

The facts in *Clifton v. Cox*, 549 F.2d 722 (9th Cir.1977) are closely analogous to the present situation. In *Clifton*, we considered murder charges brought by the State of California against Bureau of Narcotics and Dangerous Drugs agent Lloyd Clifton. Clifton had been involved in a helicopter raid on the cabin of Dirk Dickenson, a suspected manufacturer of drugs. As Clifton exited the helicopter, fellow agent Filben crumpled to the ground. Believing that Filben had been shot, Clifton kicked in the door of the cabin and charged at Dickenson. Dickenson fled into the woods. Clifton called at him to halt; Dickenson did not. Believing that Dickenson had shot his fellow agent, and that Dickenson would pose a greater danger to the other agents if he reached the shadows of the woods, Clifton shot him. Dickenson died. He turned out to be unarmed, and Filben had simply tripped. Relying on *Neagle*, we found Clifton to be immune from state court prosecution. Clifton acted within the scope of his authority, and his conduct was necessary and proper under the circumstances. *See Clifton*, 549 F.2d at 728–29.

In *Clifton* we found that the agent's behavior was objectively reasonable. Clifton incorrectly believed that a federal officer had just been shot, that the suspect was armed, and that the suspect, though fleeing, would present a greater threat to the pursuing agents if he reached the safety of the woods. Here, the facts are even more persuasive than in *Clifton*. Horiuchi knew a federal officer had been shot; he knew that Harris was armed; he thought that Harris had threatened the helicopter; and he thought that Harris would present a greater threat to the agents if he reached the safety of the house.

The State claims that here, unlike in *Clifton*, the evidence is "hotly disputed," and thus, under *Morgan v. California*, 743 F.2d 728 (9th Cir.1984), the court should not have granted the motion to dismiss.

*Morgan* is distinguishable. There, we considered whether the circumstances warranted a conclusion that the officers were in fact acting within the scope of their official duties at the time of the state-law violations. Several Drug Enforcement Administration agents had, apparently while drunk, backed their car into the car of a civilian couple. According to the couple, the agents brandished their guns and threatened the couple with arrest. The State of California charged the agents with several misdemeanor violations, including driving under the influence, assault with a deadly weapon, brandishing a firearm, and unlawful use of force.

The agents in *Morgan* petitioned for a writ of habeas corpus, claiming that when the incident occurred they had been en route to a meeting with an informant. The State, however, contended that the agents had merely been on their way to another bar. We reversed as an abuse of discretion the district court's granting of the writ, on the ground that disputed issues of material fact rendered this particular controversy "hotly disputed." *Id.* at 733. In reversing the order granting the writ of habeas corpus, we held that:

> the grant of the writ was proper only if, (1) viewing the disputed evidence in the light most favorable to the state, it is clear that Morgan and Swanson were acting within the scope of their federal authority and that their actions were necessary and proper to carry out that authority, or (2) it is shown that the state criminal prosecution is intended to frustrate the enforcement of federal law.

*Id.*

In the present case, unlike *Morgan*, the evidence is not "hotly disputed." The State argues that it is unclear where Vicki Weaver was standing at the time of the fatal shot, and therefore it is disputed whether Horiuchi saw her. Horiuchi states that he did not see Vicki Weaver. The State has produced no evidence that is materially inconsistent with Horiuchi's tes-

timony. Although the State points to the testimony of both Sara Weaver and Randall Weaver that each saw Vicki Weaver come outside of the house, (thus implying that Horiuchi should have seen her), neither one can place her outside the threshold of the door in a location that Horiuchi could see, at the time the fatal shot was fired. Sara Weaver testified that as she stumbled into the house, her mother was standing right in front of the doorway. She did not, however, remember if Vicki Weaver was outside the threshold of the door.

Although Randall Weaver testified that Vicki Weaver had been standing three or four feet beyond the porch holding the baby just after he was shot at the birthing shed, when questioned regarding Vicki Weaver's location when he was running back toward the house, Randall Weaver did not know where she was standing. "She came out of the house with the baby—she might have been on the porch. I don't know to be honest with you. I know that she had the baby when she hollered at me and she was holding the baby when we went through the door." Neither Sara nor Randall Weaver's testimony is inconsistent with Horiuchi's testimony that he did not see Vicki Weaver.

Horiuchi states that he never saw Vicki Weaver. Once Randall Weaver, Sara Weaver, and Kevin Harris came outside the cabin, he watched them, often through the narrow scope of his rifle. He told his partner to stay on the front door. Even taking as true Randall Weaver's uncertain testimony that his wife might have been three to four feet off the porch at the time that he was shot, this testimony is not inconsistent with Horiuchi's testimony that he never saw Vicki Weaver.

The State points to Horiuchi's own testimony that as Harris ran toward the house,

"[h]e [Harris] had his weapon in his right hand and he was reaching out with his left hand. It appeared to me like he was trying to hold the door open or moving somebody out of the way, and that's the time I shot." Although Horiuchi's statement is not clear, it does not imply that Vicki Weaver was outside the threshold of the door, that Horiuchi saw her, or that he knew she was behind the door. The district court did not, as is argued by the State, improperly decide a disputed issue of fact; Horiuchi's testimony that he never saw Vicki Weaver and did not know she was behind the door is not disputed.

Finally, the State would have us hold that it was objectively unreasonable for Horiuchi to shoot because the rules of engagement were obviously unconstitutional. We need not pass on the constitutionality of the rules of engagement as such. It is Horiuchi's conduct, not the rules of engagement, which must be judged.

The State cites extensively to *Harris v. Roderick*, 126 F.3d 1189 (9th Cir.1997), where Kevin Harris filed a *Bivens* suit claiming that Horiuchi used deadly force unconstitutionally. The district court denied Horiuchi's and the other agents' motion to dismiss on the ground of qualified immunity. On interlocutory appeal, this court upheld the district court's holding. With regard to Horiuchi's claim for qualified immunity, this court stated: "[I]t is extremely doubtful ... that Horiuchi will ever be able to establish that he is entitled to qualified immunity for his conduct in shooting Harris ... as the record now stands, he cannot do so." *Id.* at 1202.[7]

Although predicated on the same incident, this court's decision in *Harris* is not applicable to the case before us now. The court there determined only that Horiuchi could not establish qualified immunity on a motion to dismiss. Accordingly, all state-

---

**7.** The court also wrote, "[t]he Special Rules violated clearly established law and any reasonable law enforcement officer should have been aware of that fact." *Id.* at 1202. This statement, made in the context of a discussion about the qualified immunity of the Rules' authors, is dicta and does not apply to the question in this case of whether Horiuchi reasonably believed his actions to be necessary and proper.

ments made in *Harris* were based on the untested allegations of Harris' complaint. *See Morley v. Walker,* 175 F.3d 756, 759 (9th Cir.1999)(in determining qualified immunity the court must take the allegations in the plaintiff's complaint as true). The court did not consider many facts apparent on the record in this case, such as Horiuchi's belief that the armed man was a threat to the helicopter. In the present case, the court must determine Horiuchi's claim for supremacy clause immunity based on the evidence as presented here.

 Moreover, *Harris* was decided on the issue of qualified immunity, not supremacy clause immunity. The State wrongly attempts to collapse the standards of qualified immunity into the "objectively reasonable" prong of supremacy clause immunity. The two immunities are not the same, nor do they serve the same purposes. Immunity under the Supremacy Clause from state criminal prosecution may cover instances in which qualified immunity does not apply. Supremacy Clause immunity derives from a specific provision of the Constitution itself, the purpose of which is to establish that federal law is the supreme law of the land. Accordingly, a federal agent doing his job in a way that is necessary and proper should not be held to answer to a state court criminal charge. In *Bivens* claims, on the other hand, qualified immunity protects a federal agent from being sued in a civil case by an individual for violating the person's constitutional rights. *See Harlow v. Fitzgerald,* 457 U.S. 800, 814–815, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982); *Katz v. United States,* 194 F.3d 962, 967 (9th Cir.1999) (Qualified immunity analysis is the same for *Bivens* actions against federal officials as it is for claims against state officials under 42 U.S.C. § 1983.). Thus, the concern addressed by supremacy clause immunity— protecting a *federal* agent from being held

to answer to *state* laws—is not at issue in qualified immunity.

Supremacy clause immunity needs to be more protective than qualified immunity because it protects federal agents from the severity of being criminally convicted and having to face state criminal sanctions. Qualified immunity simply protects against monetary sanctions in a civil suit. Further, the federal government itself, not just the agent, has a real stake in upholding supremacy clause immunity. In sum, the two immunities are separate and there are no grounds for collapsing the two.

The judgment of the district court dismissing the charge against Horiuchi is therefore AFFIRMED.

KOZINSKI, Circuit Judge, dissenting:

> [W]e conclude that the second shot violated
> the Constitution. We recommend that the
> circumstances surrounding the second shot be
> reviewed by the appropriate component of the
> Department of Justice for prosecutive merit.
>
> U.S. Department of Justice,
> Office of Professional Responsibility.[1]

Besieged by a platoon of FBI agents with high-powered rifles, two armored vehicles and a helicopter, the suspects at Ruby Ridge posed no immediate danger. There was no chance they could escape and take hostages. There was plenty of time to call out a warning, and there were many occasions to give the suspects a chance to surrender. Instead, FBI Agent Lon Horiuchi shot and killed Mrs. Weaver.

A Senate Committee, the Justice Department's Office of Professional Responsibility and a prior panel of this court all have concluded the shooting was patently

---

**1.** United States Department of Justice, Report of the Ruby Ridge Task Force to the Office of Professional Responsibility of Investigation of Allegations of Improper Governmental Con-

duct in the Investigation, Apprehension and Prosecution of Randall C. Weaver and Kevin L. Harris, June 10, 1994, [hereinafter "DOJ Report"] at Section IV.F.4.

unconstitutional. *See Harris v. Roderick*, 126 F.3d 1189, 1203 (9th Cir.1997), *cert. denied sub nom. Smith v. Harris*, 522 U.S. 1115, 118 S.Ct. 1051, 140 L.Ed.2d 114 (1998). Because the majority's contrary ruling creates a square intra-circuit conflict and throws a monkey wrench into our law governing the proper use of deadly force, I strongly dissent.

## I

The facts here are largely not in dispute.[2] Six Deputy U.S. Marshals, dressed in camouflage gear and armed to the teeth, came onto the Weaver property in the dead of night, without announcing their presence or wearing visible identification. They got into a shootout which left one deputy and the Weavers' son dead. More than thirty hours later, FBI agents surrounded the Weaver cabin, which was located in the middle of the forest, far from any bystanders; they overflew the area by helicopter several times. The FBI agents did not announce their presence nor did they give the occupants an opportunity to surrender. Instead, the agents remained concealed and watched the cabin through the scopes of their rifles. Those in the cabin first learned of the FBI's presence when Horiuchi opened fire.

Horiuchi fired two shots. The first was arguably justified by what he claims was a menacing gesture from Mr. Weaver in the direction of the helicopter. How Horiuchi could tell the man was threatening the helicopter is a bit of a mystery, since Horiuchi admitted that he had no clue where the helicopter was.[3] But Idaho is not prosecuting Horiuchi for *that* shot. Rather, it is the second shot-fired some twenty seconds later-that is the basis of the state's prosecution. When Horiuchi was taking aim for this shot, the three people who had ventured outside the cabin were running headlong toward it. They were facing the cabin and away from the helicopter. They were not aiming their weapons. They were making no menacing gestures. Running for their lives, they threatened no one. As the Department of Justice investigators observed: "[E]ven giving deference to Horiuchi's judgment, we do not find that the second shot was based on a reasonable fear of an immediate threat to the safety of officers or others." DOJ Report, note 1 *supra*, at Section IV. F.3.c.(3) (internal quotation marks omitted).[4] Yet, Horiuchi calmly took aim and

---

**2.** The one key factual dispute cuts against the majority's conclusion. While the majority claims Horiuchi was unaware of Mrs. Weaver's presence behind the door, Maj. Op. at 996, there is evidence that he *should* have known, which could make his decision to shoot blind through the door objectively unreasonable:

> However, even if Horiuchi's judgment on the necessity to use deadly force was supportable, we believe that his second shot was taken without regard for the safety of others near Harris. Although Horiuchi could not see behind the front door of the cabin, he had reason to believe that someone might be on the other side when he took his second shot. At trial he testified that it appeared that Harris "was trying to hold the door open or moving somebody out of the way" when Horiuchi fired. When asked if he "knew there was somebody behind the door," Horiuchi responded that he "wasn't shooting at the individual behind the door." However, by fixing his cross hairs on the door, when he believed someone was behind it, he placed the chil-

dren and Vicki Weaver at risk, in violation of even the special Rules of Engagement: If any adult male is observed with a weapon prior to the announcement deadly force can and should be employed if the shot could be taken without endangering any children.... In our opinion he needlessly and unjustifiably endangered the persons whom he thought might be behind the door.

DOJ Report, note 1 *supra*, Section IV.F.3.c.(3) (footnotes omitted).

**3.** "I don't know where the helicopter was, sir, I would be guessing if I told you where it was." Excerpt of Testimony of Lon T. Horiuchi, *United States v. Weaver and Harris*, No. 92–080–N–EJL [hereinafter "Horiuchi Testimony"] at 259 (June 4, 1993).

**4.** The DOJ investigators relied on Horiuchi's own words in concluding that he acted unreasonably in taking the second shot: "In a statement Horiuchi prepared later that evening, he explained that, just before Harris entered the cabin, he 'stopped at the door

shot to kill. That he aimed at Harris, thinking it was Mr. Weaver, but actually killed Mrs. Weaver does not help Horiuchi. His confusion as to the target only proves he was reckless in pulling the trigger.

What justification can there be for shooting a man who is completely surrounded by heavily armed law enforcement agents? The sum and substance of the majority's reasoning is as follows: "Had [Horiuchi] hesitated for even a few seconds or called out a warning ... Harris could have fled into the cabin, *taking up a defensive, armed position.*" Maj. Op. at 994 (emphasis added). *See also id.* at 994 ("he was running to a place where he could rearm, regroup, and take up a defensive position"); *id.* at 994 ("Once inside [the cabin] Harris could take up a defensive position where he could shoot out, but the officers could not shoot in without the danger of harming a child.").

Since when does taking up a defensive position justify the use of deadly force? Taking a defensive position may have kept the suspects from being apprehended right away, but it would have posed no immediate threat to the officers. Missing from the majority's justification for the shooting is any indication that, once inside the cabin, Harris would pose an *immediate* threat to life and limb. Absent a threat, the FBI agents were not entitled to kill; rather, they should have employed one of the many other measures at their disposal, such as:

- Announcing themselves and demanding a surrender

- Commencing negotiations

- Waiting until the inhabitants ran out of food

- Shutting off water and electrical service to the cabin

- Sending in an armored personnel carrier to knock down various out-

buildings and impress the inhabitants with the futility of resisting

Once the trigger is pulled and life is taken, all these options are foreclosed; the chance for a bloodless resolution is lost. Allowing the suspects to take a defensive position gives them time to think, to consider, to weigh their options, to calculate the risks to themselves and their children. It can lead to a peaceful surrender, as it did eight days later. It is therefore immensely troubling that the majority today holds-for the first time anywhere-that law enforcement agents may kill someone simply to keep him from taking up a defensive position. This conclusion runs contrary to a long line of deadly force cases, all of which hold that only an *immediate* threat to life and limb will justify an intentional killing by law enforcement agents. *See, e.g., Graham v. Connor,* 490 U.S. 386, 396, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989) (review of officer's use of force requires "attention to the facts and circumstances of each particular case, including ... whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight."); *Tennessee v. Garner,* 471 U.S. 1, 11, 105 S.Ct. 1694, 85 L.Ed.2d 1 (1985) ("Where the suspect poses no immediate threat to the officer and no threat to others, the harm resulting from failing to apprehend him does not justify the use of deadly force to do so."); *see also Harris,* 126 F.3d at 1201 (Police "may not shoot to kill unless, at a minimum, the suspect presents an immediate threat to the officer or others, or is fleeing and his escape will result in a serious threat of injury to persons.").

Horiuchi claims he was entitled to kill Harris to prevent him from shooting at the helicopter from inside the cabin. But killing Harris was not even remotely necessary to ensure the safety of the helicopter. To begin with, while Horiuchi may have

looking for either the helicopter or where the shot came from....' Thus, even Horiuchi does not characterize these movements as

threatening or as provocation for the second shot." DOJ Report, note 1 *supra,* at Section IV.F.3.c.(3) (footnote omitted).

heard the helicopter's engine,[5] he did not see it or know where it was;[6] he had no reason to believe that it was hovering within range of small arms fire from the cabin. Quite the contrary: During a reconnaissance mission earlier that day, he had observed the helicopter pilot taking precautions. According to Horiuchi, the helicopter "popped over the hill low and then came back over." Horiuchi Testimony, note 3 *supra*, at 191 (June 4, 1993).[7] The helicopter had also flown several other missions over the area without incident.

Moreover, Horiuchi was in radio contact with the FBI command center and could have called out a warning.[8] In the time it would have taken the three to run into the cabin, take positions at the windows and commence shooting, Horiuchi could have warned the helicopter to move out of range. While an officer need not exhaust remote alternatives before resorting to deadly force, *see Forrett v. Richardson*, 112 F.3d 416, 420 (9th Cir.1997), his failure to employ an obvious non-deadly alternative can make his use of deadly force unreasonable. *See Brower v. County of Inyo*, 884 F.2d 1316, 1317–18 (9th Cir. 1989) (inquiry into reasonable non-deadly alternatives is important to establishing that deadly force was necessary to prevent escape).

But put all else aside and consider only Horiuchi's admission that *he made no sep-*

---

5. Idaho does not seem to dispute that Horiuchi heard the helicopter, but the Senate Subcommittee expressed doubt. At the very least, there is conflicting evidence. Randy Weaver testified that "all was quiet" at the time of Horiuchi's first shot. Moreover, "Weaver maintains that, had they heard a helicopter at this moment, they all would have run back to the cabin immediately." The Federal Raid on Ruby Ridge, ID: Hearings Before the Subcomm. on Terrorism, Technology, and Government Information of the Senate Comm. on the Judiciary, 104th Cong., First Session, at 1115 (1995) (Appendix, Ruby Ridge: Report of the Subcommittee) [Hereinafter "Senate Report"]. All factual disputes must be resolved against Horiuchi at this stage of the proceedings. *See Morgan v. California*, 743 F.2d 728, 733 (9th Cir.1984).

6. During his direct examination in the Weaver criminal trial, Horiuchi implied that he had a general idea as to the location of the helicopter:

 Q: When you saw the activity in the house area, could you tell from the sound where the helicopter was at that particular time?

 A: Generally, sir, it was either behind me or to my right or to my left.

 Q: You couldn't see the helicopter at the time you saw the activity, is that correct?

 A: No, sir, once the activity started, I was concentrating on the three individuals that came out of the building, not the helicopter.

 Horiuchi Testimony, note 3 *supra*, at 67–68 (June 3, 1993). However, on cross-examination, he admitted that he had no clue as to the helicopter's location:

 Q: The helicopter was behind you?

 A: I don't know where the helicopter was, sir, I would be guessing if I told you where it was.

 *Id.* at 259 (June 4, 1993).

7. Horiuchi presented conflicting testimony about whether he thought the helicopter was in danger. At Weaver's criminal trial, he claimed the helicopter "wasn't necessarily out of rifle range" during the reconnaissance flight he took. But on cross he was impeached by a statement that he made previously to the effect that the helicopter "stayed well out of [rifle] range" during his flight. *Id.* at 258 (June 4, 1993).

8. At oral argument, Horiuchi's counsel represented that the agents were under orders to maintain radio silence. Counsel did not provide record support for this assertion and it turns out not to be true, as one of Horiuchi's fellow agents did use the radio to alert the FBI command center that individuals outside the cabin were on the move: "I believe it was Special Agent Love in Sierra 1 position who saw them coming out at the same time, pretty much the same time I did, and he radioed back to the command post that three individuals had come out of the building." *See* Horiuchi Testimony, note *supra*, at 77 (June 3, 1993). Horiuchi testified that the only reason he didn't radio himself was that a momentary malfunction caused Agent Love to "beat [him] to the punch." *Id.* At the time he fired, Horiuchi knew that the helicopter pilot had been warned that there were people outside the cabin, and that additional warnings could be given if necessary.

*arate decision whether to take the second shot:* "I had already made that determination after that first shot, so if I saw him again[,] I was going to shoot at that individual again." Horiuchi Testimony, note 3 *supra,* at 107 (June 3, 1993). Horiuchi's testimony, which the majority overlooks, is crucial in light of *Hopkins v. Andaya,* 958 F.2d 881, 887 (9th Cir.1992), where we held that the justification for the use of deadly force, once established, does not continue indefinitely. If circumstances change and the threatened danger abates, deadly force may cease to be reasonable. As the DOJ investigators observed, "the circumstances which justified the first shot were significantly changed by the time the second shot was taken. There had been no return of fire or further threatening action, there had been no surrender announcement, and most significantly, the targets were retreating into the cabin." DOJ Report, note 1 *supra,* at Section IV. F.4. The majority creates a direct conflict with *Hopkins* by holding that law enforcement officers are entitled to gun down a suspect even after he no longer poses an immediate danger to anyone.

There is another big problem with Horiuchi's second shot: He was aiming at the wrong target. The individual he claims to have observed holding a long gun and looking menacingly in the direction of the

helicopter was Weaver, not Harris. Horiuchi then observed three people-two of them similarly dressed males-running toward the cabin. In his testimony, Horiuchi admits he could not tell the two men apart; in fact, he shot the wrong one.[9] Any suspicion Horiuchi had that Weaver might shoot at the helicopter could not be attributed to Harris simply because he was nearby and dressed alike. The matter would be different if Horiuchi had reasonably believed he was in the grips of a firefight. *See Clifton v. Cox,* 549 F.2d 722, 729 (9th Cir.1977). But Horiuchi makes no such claim, and by adopting its "defensive position" rationale, the majority recognizes that this was not a fire fight. While we will not lightly second-guess decisions made by law enforcement officers in the heat of battle, this was not the heat of battle and caution was therefore appropriate.[10] A menacing gesture by one of the individuals outside the cabin did not give Horiuchi the right to gun all of them down in cold blood.

I also find it highly significant that Horiuchi, alone among the agents surrounding the cabin, considered the danger serious enough to open fire. Even after Horiuchi's first shot rang out, Harris and the Weavers were not peppered by bullets from the other sharpshooters hidden in the hills above the cabin. As the DOJ Report

---

9. The DOJ investigators recognized the same problem: "Horiuchi also confused his targets. He erroneously believed that the last man returning [to] the cabin [w]as the man he had originally tried to shoot. Thus, Horiuchi never saw Harris, the target of his second shot, take any threatening action toward the helicopter." DOJ Report, note 1 *supra,* at Section IV.F.3.c.(3).

10. The Senate Subcommittee expressed a similar view:

We do not want in any way to hamstring the police officer involved in a hot pursuit or close range confrontation with a dangerous criminal. Those women and men have to make snap judgments every day, and we have no wish to increase their personal risk by requiring undue hesitation before they protect themselves.

But in the case of the snipers on Ruby Ridge, no such personal or immediate danger

existed. When Horiuchi fired, he was in a concealed, safe and remote firing position. He had time to think before he shot, time to be briefed before he was deployed, and time to calmly plan his actions. Under those circumstances, what Horiuchi saw as Weaver, Harris and Sara fled back toward their cabin-where one child (two, as far as law enforcement officers were aware) and one infant were present-gave him insufficient justification to fire his weapon.

It is not our purpose to urge (or to urge against) prosecution or other sanction against Agent Horiuchi. But it is the Subcommittee's firm purpose to make sure that in the future, in similar circumstances, inappropriate and unconstitutional deadly force like the second Ruby Ridge shot will never again be used. Senate Report, note 5 *supra,* at 1120.

observed, "Many of the sniper/observers saw three people running to the cabin after the first shot. None reported any action that could immediately be interpreted as threatening to the helicopter or the sniper/observers." DOJ Report, note 1 *supra,* at Section IV.F.3.c.(3). If Horiuchi was justified in shooting, all the other FBI sharpshooters must have been derelict in holding their fire.

Finally, I return to the immovable fact that the occupants of the cabin were given no opportunity to surrender before deadly force was unleashed against them. Giving a warning and opportunity to surrender is not just an aspirational goal; it is a required step before deadly force may be used. It is true that we have qualified this requirement with such phrases as "where feasible," *see, e.g., Forrett,* 112 F.3d at 420, but this does not mean warnings can be dispensed with whenever they would be inconvenient. A warning and an opportunity to surrender must always be given before deadly force is used, *unless* doing so would materially increase the danger to law enforcement personnel or bystanders. This contemplates a narrow class of cases, such as where the suspect has opened fire, pulled a gun, or credibly threatened vulnerable targets.

It is conceivable that Horiuchi was entitled to take his first shot without giving a warning,[11] but thereafter neither Harris nor Mr. Weaver nor anyone else connected with the cabin was shooting or even aiming weapons at any vulnerable targets. To become a threat again, as Horiuchi supposedly feared, they would have had to enter the cabin, take their places at a window and start shooting. This interval gave Horiuchi plenty of time to shout out a surrender demand.[12]

Nor was this the only interval when a warning could-and should-have been given. FBI agents had staked out the Weaver cabin since earlier that morning, while the shooting took place in late afternoon. Obviously, those involved in the operation had ample time to give the necessary warning before deploying agents with shoot-on-sight orders.[13] Even after Horiuchi and

11. The Senate Subcommittee expressed doubt on this score: "Although we are not prepared to conclude that the first shot was unconstitutional, we are concerned for several reasons that the perception of an imminent threat to the helicopter was not what caused Horiuchi to take the first shot...." Senate Report, note 5 *supra,* at 1116.

12. The majority doubts that Horiuchi could have been heard, Maj. Op. at 994, but Horiuchi testified that he was near enough to hear voices from within the cabin, *see* Horiuchi Testimony, note 3 *supra,* at 13 (June 3, 1993) (agents heard "screaming, a single male voice" from their positions). It is therefore likely that a shouted warning from one or more of the agents would have been heard by the three as they fled toward the cabin. Or, Horiuchi might have alerted the helicopter or one of the armored transports to call out a surrender demand using loudspeakers. At the very least, this is a disputed fact that must be resolved against Horiuchi at this stage of the proceedings. *See United States ex rel. Drury v. Lewis,* 200 U.S. 1, 8, 26 S.Ct. 229, 50 L.Ed. 343 (1906); *Morgan,* 743 F.2d at 733.

13. The Special Rules of Engagement, which have been criticized by everyone including FBI Director Louis Freeh, *see* The Federal Raid on Ruby Ridge, ID: Hearings before the Subcomm. on Terrorism, Technology, and Government Information of the Senate Comm. on the Judiciary, 104th Cong., First Session, at 1087 (1995) (statement of FBI Director Louis J. Freeh), were indeed shoot-on-sight orders. *See* Senate Report, note 5 *supra,* at 1111. Many who have looked at the second shot have speculated that it was the patently unlawful Rules of Engagement that may have been responsible for Agent Horiuchi's action, rather than the makeshift justification he cobbled together later. Because the Rules have been found to be unconstitutional by virtually everyone who examined them, *see id.; Harris,* 126 F.3d at 1205, Horiuchi's counsel explicitly declined to rely on them to exonerate his client:

The Court: If your client is relying on [the Rules of Engagement] as a part of his justification, we have to deal with [them].
Mr. Hoffinger: He's not. And let me make that very clear.... He's not relying on the Rules of Engagement to justify his conduct. Audio Recording of Oral Argument in *Idaho v. Horiuchi,* No. 98–30149 (before the 9th Circuit Court of Appeals, recorded in Pasadena, California, June 9, 1999).

his team had taken their places around the cabin, approximately half an hour passed during which the Hostage Rescue Team members could have called out a warning and given those in the cabin a chance to surrender. It was wholly unreasonable for Horiuchi to open fire, knowing that the civilians at whom he was aiming were unaware of the danger and had no chance to surrender rather than die. *Accord Harris,* 126 F.3d at 1203. That all the other sharpshooters held their fire tells us all we need to know on this score.

## II

As the majority recognizes, the standard for granting a motion to dismiss on grounds of Supremacy Clause immunity is whether the officer's actions were objectively reasonable. Maj. Op. at 993. Precisely the same standard applies to qualified immunity claims in police brutality cases. *See LaLonde v. County of Riverside,* 204 F.3d 947, 959 (9th Cir.2000) ("Under the Fourth Amendment, police may use only such force as is objectively reasonable under the circumstances." (citing *Graham v. Connor,* 490 U.S. 386, 397, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989))). The identity of language is no coincidence; it reflects the fact that the question, in both types of cases, is exactly the same: Did the agent's conduct violate the Constitution? Our cases, as well as those from the Supreme Court, make it clear that law enforcement officers may not take human life unless they *reasonably* believe that doing so is necessary to prevent death or injury to officers or to bystanders. Here, there were no bystanders; the operation took place in the middle of nowhere. And there was no legitimate threat to the agents as they were concealed from view hundreds of yards away from the cabin.

This case is therefore quite different from *Clifton,* on which the majority relies. In that case, federal agents stormed the cabin of a suspected drug dealer. *Clifton,* 549 F.2d at 724. During the raid, it looked as if the suspect had shot one of the

agents. An agent who sees a colleague felled before his eyes obviously has a reasonable fear he might be next. Even then, Clifton gave the suspect an opportunity to surrender by *twice* shouting for him to halt and each time waiting to see if he would comply. Only when it looked like the suspect would reach the woods, where he might escape and take hostages, did Clifton fire. *See id.* Here, Horiuchi shot-and then shot again-without giving the suspects a chance to surrender. Nor did Horiuchi believe that the suspects had just shot a fellow officer; there had been no shooting on the property for over thirty hours. As the Senate Committee that spent many months investigating this incident concluded, Horiuchi's second shot was objectively unreasonable:

> We do not believe that there is any credible evidence that the three individuals who were running into the cabin presented a threat of grievous bodily harm or death to Agent Horiuchi or anyone else. The three were running for the cover of the cabin. They had not returned the sniper's fire and, according to Horiuchi's trial testimony, they were running faster than when they emerged from the cabin. The FBI had not previously considered the Weavers and Harris a significant threat from within the cabin. The FBI had decided to accept the risks posed by these suspects as they remained in their cabin, in making plans to negotiate with them while they remained inside. The helicopter had taken several flights earlier in the day, and the Weavers had not shot at it from the cabin. *The second shot, therefore, was not objectively reasonable.*

Senate Report, note 5 *supra,* at 1119 (citations omitted) (emphasis added). The Department of Justice rejected Horiuchi's justification for the second shot in even more categorical terms:

> We find Horiuchi's explanation of the threat and necessity of the second shot speculative. Based on the facts known and the actions of the subjects, we do

not believe it was reasonable to perceive an immediate threat as they ran back into the cabin. Once the family was back in the cabin, the potential threat to the safety of the helicopter and law enforcement personnel was more remote than when Horiuchi had earlier believed that the armed male was about to position himself to shoot at the helicopter. Although we believe Harris and the Weavers knew that law enforcement personnel were present, no call out or surrender announcement followed the first shot. The subjects were never given a chance to drop their arms to show that they did not pose a threat. The subjects simply did what any person would do under the circumstances: they ran for cover.

. . . . .

Although we agree that Harris and the Weavers could have fired from inside the cabin, we do not believe that this potential, especially considering the circumstances of the this [sic] case, warranted law enforcement to perceive an immediate threat. Since the exchange of gunfire at the Y [30 hours earlier], no one at the cabin had fired a shot. Indeed, they had not even returned fire in response to Horiuchi's first shot. Furthermore, at the time of the second shot, Harris and others outside the cabin were retreating, not attacking. They were not retreating to an area where they would present a danger to the public at large or take members of the public hostage. Instead, they were retreating into a cabin and within rifle shot of well equipped law enforcement personnel. Finally, as we discussed below, prior to this time, law enforcement personnel had not viewed the presence of Weaver and Harris in the cabin as posing a particular threat. In our view these facts undercut the immediacy of the threat that Harris posed to Horiuchi and his colleagues.

DOJ Report, note 1 *supra,* Section IV. F.3.c.(3) (footnotes omitted).

Our own court considered this question in *Harris,* a case involving the same incident. *Harris* was the *Bivens* action brought against Horiuchi and other federal agents for injuries suffered as a result of the shooting. Horiuchi argued that he was entitled to qualified immunity, raising the same "defensive position" argument the majority embraces here: "Horiuchi asserts that the shot he fired while Harris was trying to return to the cabin was objectively reasonable because Harris presented a greater danger when he was in the cabin than when he was outside...." 126 F.3d at 1203. *Harris* categorically rejected this argument:

> Law enforcement officials may not kill suspects who do not pose an immediate threat to their safety or to the safety of others simply because they are armed. Whenever practicable, a warning must be given so that the suspect may end his resistance or terminate his flight. A desire to prevent an armed suspect from entering the place he is residing because it may be difficult to persuade him to reemerge is insufficient cause to kill him. Other means exist for bringing the offender to justice, even if additional time and effort are required. When Horiuchi shot Harris, without any warning, as he was retreating toward an area of safety, he acted in a patently unreasonable manner that violated clearly established law. That the conduct at issue violated Harris's constitutional rights should have been plain to any reasonable officer.

*Id.* at 1204.

The majority tries in vain to distinguish *Harris* by arguing that the panel there "did not consider many facts apparent on the record in this case, such as Horiuchi's belief that the armed man was a threat to the helicopter." Maj. Op. at 1000. But any threat to the helicopter could justify only Horiuchi's first shot-which he took after he allegedly saw one of the men look menacingly in the direction of the helicopter. Once the man started running toward

the cabin, the immediate threat to the helicopter ceased. The helicopter could have been warned to move out of range, if such warning were even necessary. *See* pp. 1000–01 *supra.* Neither this fact, nor any other, distinguishes this case from *Harris.*

The majority also suggests that Horiuchi is entitled to more latitude because different standards should apply to claims of Supremacy Clause immunity than to those of qualified immunity. *See* Maj. Op. at 997. This might be a plausible argument but for the fact that *precisely* the same test applies as to both: Did the officer act constitutionally? I don't understand how an officer could have acted unconstitutionally for purposes of qualified immunity and yet constitutionally for purposes of Supremacy Clause immunity. Either the officer's actions complied with constitutional norms or they did not. Nor do I see how the standards can be disaggregated conceptually. What protects an officer from civil and criminal liability is the lawfulness of his actions. But if the officer's actions are found to be unlawful, it is difficult to see how or why the Supremacy Clause would stand in the way of a state's legitimate interest in the enforcement of its criminal laws.

The majority creates a square conflict with *Harris,* and with many of our other cases that strictly limit the circumstances under which an officer may use deadly force. *See, e.g., Forrett,* 112 F.3d at 420; *Hopkins,* 958 F.2d at 887. Perhaps most troubling, the opinion waters down the constitutional standard for the use of deadly force by giving officers a license to kill even when there is no immediate threat to human life, so long as the suspect is retreating to "take up a defensive position." This has never been the law in this circuit, or anywhere else I'm aware of-except in James Bond movies. Because the 007 standard for the use of deadly force now applies to all law enforcement agencies in our circuit-federal, state and local-it should make us all feel less secure. In an effort to protect a defendant who lost his head and acted in a patently unconstitutional manner, the majority has materially weakened the standard that heretofore constrained all law enforcement personnel in the Ninth Circuit. Because I fear this change in our long-standing law, I must register my dissent.